**FILED**

MAR – 2 2017

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

|  |  |
|---|---|
| **DOUGLAS J. BRICKLEY, Trustee for the CryptoMetrics, Inc. Creditors' Trust,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No: 5:13-cv-834-RCL** |
| ) | |
| **SCANTECH IDENTIFICATION BEAMS** ) **SYSTEMS, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

This case comes before this Court from the United States Bankruptcy Court for the Western District of Texas after withdrawal of the reference. In 2011, the Bankruptcy Court confirmed the debtor's (CryptoMetrics) Second Amended Chapter 11 Plan, after which a creditors' trust and shareholders' trust were established for the benefit of creditors and non-insider equity interest holders. Douglas J. Brickley is the trustee of these trusts and is the sole management of the post-confirmation debtor. On September 17, 2012, Mr. Brickley filed a Complaint against the defendants here, initiating an adversary proceeding, and on February 22, 2013, filed his First Amended Complaint. The following defendants have moved to dismiss: Michael Stolzar and Karlen & Stolzar (the "Stolzar defendants"); ScanTech Security, LLC f/k/a Identification Beam Systems, LLC ("ScanTech IBS") and ScanTech Holdings, LLC (collectively, the "ScanTech defendants"); ScanTech Identification Beam Systems, LLC ("SIBS"); and Robert Barra, Susan Barra, and Michael Vitale.

1

The defendants have raised numerous grounds for dismissal. For the following reasons, the Court finds that it has subject matter jurisdiction over the claims asserted in this case, and that the trustee has standing to assert the claims for avoidance and recovery of fraudulent conveyances asserted in Counts I–V, the breach of fiduciary duty claims in Counts VI, VII, and XIV, and the RICO claims in Counts IX–XI, but not the unjust enrichment, legal malpractice, or civil conspiracy claims in Counts XII, XIII, or VIII. Counts XII, XIII, and Counts VIII will be dismissed. The Court finds it has personal jurisdiction over defendant SIBS.

The Court also finds that the *Wagoner* rule does not defeat standing to assert the RICO claim against the Stolzar defendants in Count IX, and the breach of fiduciary duty claim asserted against the Stolzar defendants in Count XIV, but that the *in pari delicto* defense bars the RICO claim and most of the breach of fiduciary duty claims. Count IX will be dismissed against the Stolzar defendants, and three of the claims in Count XIV will be dismissed against the Stolzar defendants.

Finally, the Court finds that the trustee has sufficiently met the pleading standards and stated the claims in Counts I–VII and IX–XI, although the trustee does not have standing to allege bank fraud as a predicate RICO offense in Count IX. Therefore Paragraph 336 will be stricken from the Complaint.

## II.   BACKGROUND

### A.   Events Leading up to the Bankruptcy of CryptoMetrics

This case began with the Chapter 11 bankruptcy of CryptoMetrics, Inc., which was declared on September, 17, 2010. CryptoMetrics was a biometric security company founded in 2000 by defendants Robert Barra and Michael Vitale who served as co-CEOs. Defendant Joel Shaw held the title of Chief Strategy Officer. CryptoMetrics' business revolved around the

development and sale of a biometric fingerprint authentication system, and it later acquired BioDentity Systems Corporation (subsequently renamed CryptoMetrics Canada, Inc. ("CCI")), along with reportedly highly marketable facial recognition technology. According to the trustee, however, CCI was on the edge of bankruptcy when acquired and had no commercially viable products. Thereafter, CryptoMetrics operated in perpetual insolvency and never fully emerged from the start-up phase. Thus, in order to attract investors, CryptoMetrics alluded to an imminent "liquidity event." This event materialized in the form of an attempted merger with JAG Media, which was eventually abandoned after the expenditure of hundreds of thousands of dollars over four years.

In addition, the trustee alleges that beginning in 2004, CryptoMetrics focused on obtaining contracts with foreign countries, utilizing foreign agents who were tasked with identifying targets for a series of illegal payoffs in the hopes of securing a contract. Allegedly, Barra and Shaw oversaw and directed this illegal payment program using agents of defendants ScanTech Holdings and ScanTech IBS in the Middle East, as well as other agents in India, to facilitate the payment of bribes to foreign officials and businesspeople. Furthermore, the scheme was structured and implemented under the guidance, counsel and advice of defendant Michael Stolzar, CryptoMetrics' attorney and a partner in the law firm of defendant Karlen & Stolzar, who also allegedly drafted highly relevant documents as part of the scheme. The trustee describes various bribery schemes, under which CryptoMetrics made payments, but never secured lucrative contacts in return, including attempts to bribe Air India and bribery and kickback schemes in the Middle East. The trustee alleges that defendant SIBS, which was formed in 2011 after the relevant actions of ScanTech IBS and after commencement of the bankruptcy proceedings in this case, is liable for

the actions of ScanTech IBS because it was formed to continue the business of ScanTech IBS, but to avoid its liabilities.

The trustee also alleges that Barra, Vitale, and Shaw misappropriated CryptoMetrics assets for their personal use, a problem that was exacerbated when Barra hired his wife, defendant Susan Barra, as bookkeeper despite her lack of financial or accounting background. The trustee includes a detailed listing of fraudulent transfers made to the Barras and to Vitale.

Finally, the trustee alleges that, with knowledge of the poor financial status of CryptoMetrics and its lack of commercial prospects, Barra and Vitale fraudulently concealed or misrepresented the state of the company's finances in order to obtain funding. He also alleges that Stolzar, with full knowledge of CryptoMetrics' financial problems, corroborated Barra's and Vitale's fraudulent statements and made further fraudulent statements to investors and lenders. In late 2008, they began attempting to obtain a loan from MBRO Capital for $2 million. However, the Loan Agreement and Opinion Letters written by Stolzar contained numerous false statements and warranties, known to be false, which were never corrected. CryptoMetrics eventually defaulted on the loan, failed, and declared bankruptcy.

### B.    The Bankruptcy Plan

On May 27, 2011, the Bankruptcy Court approved and confirmed the debtor's Second Amended Chapter 11 Plan for the resolution of outstanding claims against equity interests in the debtor. *See* Debtor's Second Amended Chapter 11 Plan, Bankruptcy Case No. 10-53622, ECF No. 126 (Bankr. W.D. Tex. April 6, 2011) (hereinafter "Plan"). Confirmation of the Plan formed both a Creditors' Trust and a Shareholders' Trust, and appointed Douglas J. Brickley as trustee. *Id.* §§ 6.2–6.3, 6.8. Section 6.15 of the Plan covers the assignment and Prosecution of Causes of Action. It states that "all Causes of Action shall be, and hereby are reserved, retained, and vested

in the Creditors' Trust for the benefit of holders of Allowed Claims and Allowed Equity Interests pursuant to the terms of this Plan." *Id.* § 6.15. It "specifically reserves the Causes of Action and, by setting forth notice to each currently known potential target of such a Cause of Action, expressly reserves such rights to survive beyond Confirmation, the finality of Confirmation, and all other legal effects of such Confirmation." *Id.* § 6.15(b). "Cause of Action" is defined as "any claim or cause of action, legal or equitable, now owned or hereafter acquired by the Debtor, Liquidating Debtor or Trustee, whether arising under any contract or federal or state law, including but not limited to any avoidance, recovery, subordination or other action of the Debtor, the Liquidating Debtor or the Trustee, (b) any right of action, including an objection or other challenge to a Claim or any objection or other challenge to an Interest." *Id.* § 1.15.

In addition, the Plan provides "Notice to Prosecutable Targets," stating that the trustee "intends to prosecute all Causes of Action, including, but not limited to those Causes of Action against the referenced target(s) listed on the List of Causes of Action attached to the Disclosure Statement as Exhibit D." *Id.* § 6.15(a). Exhibit D includes a table of potential claims against several of the defendants here.

Finally, the Disclosure Statement states that "significant sums of money were paid out to agents and others persons around the world that appear at least to have been wasted funds and perhaps subsidized illegal activities," and that such payments were the subject of criminal investigations. *See* Second Amended Disclosure Statement for the Debtor's Second Amended Chapter 11 Plan at 5, Bankruptcy Case No. 10-53622, ECF No. 123 (Bankr. W.D. Tex. April 6, 2011). It informs parties that "[t]he factual allegations that form the basis of the criminal investigation shall also be the basis of potential litigation of the Post Confirmation Trust. Any and all individuals that are the subject of the criminal investigations, whether known or not presently

5

known by the Debtor and its current representatives, are potential defendants in the claims to be asserted by the litigation trust and are hereby put on such notice." *Id.* at 5 n.2.

### C.   The Adversary Proceeding and Motions to Dismiss

After approval of the Plan, the trustee filed a Complaint against the defendants named here, commencing an adversary proceeding. He brings the following claims: 1) five causes of action for the avoidance and recovery of fraudulent transfers under state and federal law (the "Avoidance Claims") against the Barras and Vitale (Counts I–V); 2) breach of fiduciary duty against Barra and Vitale (Count VI); 3) aiding and abetting breach of fiduciary duty against Susan Barra (Count VII); 4) civil conspiracy against Barra, Vitale, Stolzar, SIBS, and the ScanTech defendants (Count VIII); 5) civil RICO claims against Barra, Susan Barra, and Stolzar based on fraud in connection with illegal payments paid with debtor funds and misrepresentations made to fraudulently obtain financing (Count IX); 6) civil RICO claims against Barra, SIBS, and the ScanTech defendants based on fraud in connection with illegal payments paid through the Joint Marketing Association between the debtor and ScanTech defendants (Count X); 7) RICO conspiracy claims against Barra, SIBS, and the ScanTech defendants (Count XI); 8) unjust enrichment against SIBS and the ScanTech defendants (Count XII); 9) legal malpractice against the Stolzar defendants (Count XIII); and 10) breach of fiduciary duty against the Stolzar defendants (Count XIV).

Several of the defendants have moved to dismiss on various grounds. They first argue that the Court lacks subject matter jurisdiction over the claims brought by the trustee. The defendants also argue that the trustee lacks standing to assert the claims he has because the claims were not properly identified and expressly and specifically preserved in the Plan. Several of the defendants argue that the claims were also not sufficiently pled under Rule 12(b)(6) or Rule 9. Finally, some of the defendants raise the following specific grounds for dismissal:

1.  The Stolzar defendants argue that the trustee lacks standing to bring any claim that Karlen & Stolzar aided in defrauding a third party under the *Wagoner* rule.

2.  The Stolzar defendants argue that the doctrine of *in pari delicto* prevents the trustee from recovering on any claim in which the principals of CryptoMetrics allegedly engaged in malfeasance.

3.  The Stolzar defendants and the Barra defendants argue that the trustee's RICO claim is barred because only a bank can bring a RICO claim where the predicate act is bank fraud.

4.  SIBS argues that the Court lacks personal jurisdiction.

5.  SIBS argues that it is not liable for the actions of ScanTech IBS.

The Court will first address the issues of subject matter jurisdiction and standing, then will turn to arguments relating to the *Wagoner* rule, *in pari delicto*, and personal jurisdiction. Finally it will determine whether the trustee has met the federal pleading standards.

## III.   SUBJECT MATTER JURISDICTION

The debtor's Plan has been confirmed and all causes of action have been assigned to the trust, managed by the trustee-plaintiff here. Defendants argue that the Court lacks subject matter jurisdiction to hear the claims raised in the trustee's Amended Complaint. Their motions to dismiss were filed while this case was pending before the Bankruptcy Court prior to withdrawal of the reference, but defendants maintain in their reply briefs that this Court lacks subject matter jurisdiction. The trustee argues that the claims asserted are either core matters arising under Chapter 11 or that they are related to debtor's bankruptcy case, and therefore that the Court has subject matter jurisdiction.

### A.   Legal Standards

District courts have jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). "Arising under title 11" means "those proceedings that involve a cause of action created or determined by a statutory provision of title

11." *In re Wood*, 825 F.2d 90, 96 (5th Cir. 1987). Claims that arise under title 11 or arise in a case under title 11 are known as "core" proceedings. *In re U.S. Brass Corp.*, 301 F.3d 296, 305 (5th Cir. 2002). 28 U.S.C. § 157 provides a non-exhaustive list of such "core proceedings," including "proceedings to determine, avoid, or recover fraudulent conveyances." 28 U.S.C. 157(b)(2).

Prior to confirmation of the bankruptcy plan, "related to" jurisdiction exists when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d at 93 (internal quotation marks omitted). When it comes to post-bankruptcy plan confirmation claims, however, the Fifth Circuit has adopted a "more exacting" theory of jurisdiction, which "attaches critical significance to the debtor's emergence from bankruptcy protection." *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390–91 (5th Cir. 2001). Thus, "[a]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Id.* at 390. The Fifth Circuit later described three factors critical to its decision that jurisdiction did not exist in *Craig's*: "first, the claims at issue principally dealt with post-confirmation relations between the parties; second, [t]here was no antagonism or claim pending between the parties as of the date of the reorganization; and third, no facts or law deriving from the reorganization or the plan [were] necessary to the claim." *In re Enron Corp. Sec.*, 535 F.3d 325, 335 (5th Cir. 2008) (internal quotation marks omitted).

### B.   Analysis

#### 1.   *Arising Under Jurisdiction*

Counts I–V of the trustee's First Amended Complaint arise under Chapter 11. Counts I and II are based on actual fraud and Counts III and IV are based on constructive fraud. Counts I

and III are brought under Section 544 of the Bankruptcy Code, 11 U.S.C. § 544, which allows for the avoidance of any transfers that are "voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(1). The trustee brings Count I pursuant to Section 276 of the New York Debtor & Creditor Law, which provides that "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. The trustee brings Count III pursuant to Section 273 of the New York Uniform Fraudulent Conveyance Act, which provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration," N.Y. Debt. & Cred. Law § 273, and/or Section 275 of the New York Uniform Fraudulent Conveyance Act, which provides that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors," N.Y. Debt. & Cred. Law § 275.

Counts II and IV are brought under Section 548 of the Bankruptcy Code, 11 U.S.C. § 548, which allows the trustee to avoid any transfers made with actual fraudulent intent, 11 U.S.C. §548(a)(1)(A), or where the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and was insolvent on the date of the transfer, 11 U.S.C. § 548(a)(1)(B). Count V is brought under Section 550 of the Bankruptcy Code, 11 U.S.C. § 550, which allows the trustee to recover the value of the property transferred and avoided under Sections 544 and 548. Each of these claims are "core proceedings" arising under title 11. *See* 28 U.S.C. § 157(b)(2)(H) (core proceedings include "proceedings to determine, avoid, or recover fraudulent

9

conveyances"). Thus, the Court has jurisdiction over Counts I–V pursuant to the "arising under" jurisdiction of 28 U.S.C. § 1334(b).

### 2.    *"Related To" Jurisdiction*

Counts VI–VIII, and XII–XIV are state law claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy, unjust enrichment, and legal malpractice.[1] Counts IX–XI are RICO claims brought under 18 U.S.C. § 1964. All claims were brought after confirmation of the Plan and are therefore subject to the "more exacting" theory of jurisdiction announced in *Craig's*, *see* 266 F.3d at 390–91, as acknowledged by the trustee. None of the parties, however, discuss weighing the factors used in *Craig's*. The trustee instead argues that in order to determine whether a matter pertains to the implementation or execution of a plan, the Court must assess the strength of the nexus between the matter and the confirmed plan, citing *In re WRT Energy, Corp.*, 402 B.R. 717, 723–26 (Bankr. W.D. La. 2007). In *WRT Energy*, the court found that liquidating trusts established pursuant to a confirmed plan "by their nature maintain a connection to the bankruptcy even after the plan has been confirmed because they often play a central role in the implementation of the plan, " and "[g]iven this nexus between the trust and the plan, courts have shown a willingness to exercise post-confirmation 'related to' jurisdiction over cases involving trusts that are successors to the interests of liquidating or reorganized debtors." 402 B.R. at 724. The defendants likewise focus largely on supporting district court cases to argue that the claims here do not relate to the implementation or execution of the Plan.

The Court will, however, weigh the three factors found to be critical in *Craig's*—whether the claims deal with pre- or post-confirmation relations between the parties, whether there was

---

[1] For the reasons stated in Section IV, the Court finds that the trustee does not have standing to assert claims for civil conspiracy (Count VIII), unjust enrichment (XII), and legal malpractice (Count XIII). Thus, the Court will not and need not address whether it has subject matter jurisdiction over these claims.

antagonism between the parties as of the date of reorganization, and whether facts or law deriving from the reorganization or the plan are necessary to the claim. *See In re Enron Corp. Sec.*, 535 F.3d at 335.

First, the claims at issue principally deal with pre-confirmation relations between the parties. In contrast to *Craig's*, where the debtor brought a claim for post-confirmation breach of contract, 266 F.3d at 388, the claims here relate to the activities of the defendants prior to confirmation, specifically with respect to activities that led to the actual bankruptcy itself. Therefore the first factor weighs in favor of jurisdiction. *Cf. Colvin v. Amegy Mortg. Co.*, 507 B.R. 169, 179 (W.D. Tex. 2014) (finding that jurisdiction existed in part because the plaintiff's avoidance claim arose post-confirmation, but involved pre-confirmation activities); *Colvin v. Amegy Mortg. Co.*, 507 B.R. 915, 924 (W.D. Tex. 2014) (finding that the court did not have jurisdiction over a state law easement claim that arose post-confirmation and did not involve any pre-confirmation activities).

The third factor, whether facts or law deriving from the reorganization or the plan are necessary to the claims, weighs against jurisdiction. Neither the plaintiff nor the defendants are the actual debtor, CryptoMetrics. The relevant claims here are brought either under state tort law or under RICO and do not implicate bankruptcy law. *Cf. In re SBMC Healthcare, LLC*, 519 B.R. 172, 187 (Bankr. S.D. Tex. 2014) (declining to exercise jurisdiction because the lawsuit involved non-debtor parties and "the Plaintiffs' direct causes of action are entirely based on state law and stem from pre-petition events"); *Pelican Ref. Co. L.L.C. v. Adams & Reese, LLP*, No. CIV.A. H-07-0578, 2007 WL 1306808, at *2 (S.D. Tex. May 3, 2007) (finding that because "state law, rather than bankruptcy law, will determine the outcome of this dispute, . . . no facts or law deriving from the reorganization or the plan [is] necessary to the claim[s]" (internal quotation marks omitted)).

Nor do the facts of this case derive from the reorganization or the plan. They all pertain events that occurred prior to reorganization. *Cf. In re MSB Energy, Inc.*, 438 B.R. 571, 587 (Bankr. S.D. Tex. 2010) (finding that there were "abundant facts and law deriving from the reorganization and the Plan that are necessary to the resolution of this Adversary Proceeding" where "numerous events in MSB's main Chapter 11 case led up to the filing of the pending suit").

Thus, the deciding factor is whether antagonism existed between the parties as of the date of reorganization. Other district courts have found that where litigation exists prior to confirmation, antagonism also clearly exists. *See In re Blast Energy Servs., Inc.*, 396 B.R. 676, 684–85 (Bankr. S.D. Tex. 2008). Here, the Plan was confirmed on May 27, 2011. The trustee's original Complaint was filed on September 17, 2012. Thus, no claims had been filed or were pending as of the date of confirmation. However, actual litigation is not necessary to find the existence of antagonism. *In re Encompass Servs. Corp.*, 337 B.R. 864, 873 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006) ("Actual litigation, *or at least antagonism between the parties*, must be present on the petition date for the court to assert jurisdiction." (emphasis added)).

Nonetheless, the contours of what constitutes "antagonism" is unclear in the caselaw, and the Fifth Circuit has not determined an overarching definition. One court very recently found that "antagonism existed in the relevant sense" where "the defendant's alleged wrongdoing harmed the company prior to the bankruptcy, and the company's cause of action appears to have accrued before the bankruptcy as well." *Schmidt v. Nordlicht*, No. CV H-16-3614, 2017 WL 526017, at *3 (S.D. Tex. Feb. 9, 2017). Another distinguished its case concerning "a claim for payment submitted between two contracting parties" with those where "the claims at issue . . . had . . . accelerated to the point of near litigation before the bankruptcy petition was filed." *In re*

*Encompass Servs. Corp.*, 337 B.R. at 873. In one of those cases, the court found that jurisdiction existed where "the claims at issue in the Complaint arose pre-petition" and "[w]hile [the debtor] chose not to formally assert the claims until after the Plan was confirmed, the claims were preserved under the Plan and assigned to the creditor's trust for prosecution, with any net recoveries to be distributed to creditors pursuant to the Plan's terms." *In re Coho Energy, Inc.*, 309 B.R. 217, 221 (Bankr. N.D. Tex. 2004).

Although no actual litigation was pending at the time of confirmation here, the Court finds that antagonism existed. The defendants' alleged wrongdoing clearly harmed the debtor company—CryptoMetrics—prior to its bankruptcy, and, if true, played a large role in actually causing the bankruptcy. *Cf. Schmidt*, 2017 WL 526017, at *3. And, such claims were preserved by the Plan, which reserved, retained, and vested all causes of actions in the trust.[2] *Cf. Coho Energy*, 309 B.R. at 221. Therefore, the Court finds that the second factor weighs in favor of jurisdiction. Because two of the three *Craig's* factors weigh in favor of jurisdiction, the Court finds that it has subject matter jurisdiction over Counts VI–VII, and IX–XI, and XIV. The Court will now address whether the trustee has standing to assert the claims he has brought.

## IV.    STANDING

The defendants next argue that the trustee lacks standing to assert claims against them because the claims were not properly identified and expressly and specifically preserved in the Plan. The Court finds that the Plan and/or Disclosure Statement here expressly, specifically, and unequivocally preserved the claims brought in Counts I–VII, IX–XI, and XIV (for avoidance and recovery of fraudulent payments, breach of fiduciary duties, and civil RICO) and therefore the trustee has standing to assert such claims. The Plan and Disclosure Statement failed to expressly,

---

[2] As determined below, the Court finds that the breach of fiduciary duty and RICO claims were properly preserved in the Plan. Again, it does not reach the issue of subject matter jurisdiction over Counts VIII, XI, and XIII.

specifically, and unequivocally preserve the claims brought in Counts VIII, XII, and XIII (for civil conspiracy, unjust enrichment, and legal malpractice). The trustee does not have standing to assert these claims and the Court will accordingly dismiss Counts VIII, XII, and XIII.

### A.    Legal Standards

The filing of a Chapter 11 petition "creates an estate comprised of all the debtor's property, including 'all legal or equitable interests of the debtor in property as of the commencement of the case,'" which includes all causes of action belonging to the debtor. *In re SI Restructuring Inc.*, 714 F.3d 860, 864 (5th Cir. 2013). Bankruptcy plans thus may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest." 11 U.S.C. § 1123(b)(3)(B). However, "[a]fter confirmation of a plan, the ability of the [debtor] to enforce a claim once held by the estate is limited to that which has been retained in the plan." *In re United Operating*, LLC, 540 F.3d 351, 355 (5th Cir. 2008) (internal quotation marks omitted). Claims must be expressly retained in the plan to be preserved, and the reservation must be "specific and unequivocal." *Id.* The purpose of such a rule is that "a debtor must put its creditors on notice of any claim it wishes to pursue after confirmation" so that they may "determine whether a proposed plan resolves matters satisfactorily before they vote to approve it." *Id.* For this reason, "blanket reservations of 'any and all claims' are insufficient." *In re SI Restructuring Inc.*, 714 F.3d at 864. To determine "whether a proper reservation has been made, 'courts may consult the disclosure statement in addition to the plan to determine whether a post-confirmation debtor has standing.'" *Id.*

B.    Analysis

1.    *Avoidance Claims (Counts I–V)*

Counts I–V are for the avoidance and recovery of fraudulent transfers under Sections 544, 548, and 550 of the Bankruptcy Code.   The Plan expressly, specifically, and unequivocally reserves the avoidance claims brought in Counts I–V.   It defines "Cause of Action" to include "any avoidance, recovery, subordination or other action of the Debtor, the Liquidating Debtor or the Trustee." Plan § 1.15.   It further defines "Avoidance Action" as "any right, claim and/or cause of action arising under any provision of Chapter 5 of the Bankruptcy Code." Plan § 1.5.   Finally, it provides notice to prosecutable targets—including "all claimants, persons, entities, and other parties who received directly or indirectly, payments, offsets, recoupments and/or rebates, or transfers of property from the debtor"—that they "may be subject to suit to recover any preferences, fraudulent transfers, or other avoidance transfers." Plan § 6.15(a).

Defendants Robert Barra, Susan Barra, and Michael Vitale argue that the avoidance claims have not been reserved against them because they were not specifically identified by name with respect to these claims.   The Fifth Circuit has, however, indicated support for the "argument that a plan need not identify the prospective defendants." *In re Texas Wyoming Drilling, Inc.*, 647 F.3d 547, 552 (5th Cir. 2011) (citing the *United Operating* Court's citation with approval to *In re Ice Cream Liquidation, Inc.*, 319 B.R. 324 (Bankr. D. Conn. 2005)); *see also In re MPF Holdings US LLC*, 701 F.3d 449, 455 (5th Cir. 2012) (interpreting *Texas Wyoming* and finding that it rejected the arguments similar to those stating that "the parties to be sued after confirmation must be individually identified" and that "the reorganization plan must state that the individually named defendants '*will be sued*—not that they *may be sued* or *could be sued* or *might be sued*'"); *In re Manchester, Inc.*, No. 08-30703-BJH-11, 2009 WL 2243592, at *5 (Bankr. N.D. Tex. July 16,

2009) ("While the Plan did not identify the specific individuals or entities that the Litigation Trustee intended to sue, the Fifth Circuit has not required that level of specificity."). This approach is in accordance with the policy that "while creditors must be told in the plan that avoidance actions will be pursued post-confirmation, individual prospective defendants [do] not have to be identified." *In re Texas Wyoming Drilling, Inc.*, 647 F.3d at 552. This Court therefore rejects defendants Robert Barra, Susan Barra, and Michael Vitale's argument that the lack of identification of them in conjunction with the avoidance claims defeats standing. The trustee has standing to assert avoidance claims in Counts I–V.

### 2. *Breach of Fiduciary Duty Claims (Counts VI, VII, XIV)*

Count VI is brought against Robert Barra and Michael Vitale for breach of fiduciary duties, Count VII is brought against Susan Barra for aiding and abetting breach of fiduciary duties, and Count XIV is brought against the Stolzar defendants for breach of fiduciary duties. The "Notice to Prosecutable Targets," in the Plan states that the trustee "intends to prosecute all Causes of Action, including, but not limited to those Causes of Action against the referenced target(s) listed on the List of Causes of Action attached to the Disclosure Statement as Exhibit D." Plan § 6.15(a). Exhibit D to the Disclosure Statement, titled "Causes of Action," contains a list of potential claims and includes the following potential claims against the defendants here:

| Claimant | Potential Claims |
|---|---|
| BioDentity Systems, LLC, including officers and directors Colonel Fawaz, Robert Barra, Adam Jackson, and Joel Shaw | Fraud, embezzlement, breach of fiduciary duties, breach of contract, conversion and tortious interference with contractual relations |
| Susan Barra | Fraud, negligence, breach of fiduciary duties, and civil conspiracy |
| Robert Barra | Breach of contract, breach of fiduciary duties, fraud, unfair trade practices, and tortious interference with contractual relations |
| Michael Vitale | Breach of contract, breach of fiduciary duties, fraud, unfair trade practices, and tortious interference with contractual relations |

| Karen & Stolzar, LLP | Aiding and abetting in breach of contract, breach of fiduciary duties, fraud, unfair trade practices, and tortious interference with contractual relations |
|---|---|

*See* Second Amended Disclosure Statement for the Debtor's Second Amended Chapter 11 Plan Ex. D, Bankruptcy Case No. 10-53622, ECF No. 123-4 (Bankr. W.D. Tex. April 6, 2011).

Breach of fiduciary duty is clearly listed as a potential claim against Susan Barra, Robert Barra, Michael Vitale, and Karlen & Stolzar, LLP. The Court rejects Stolzar's argument that the claims have not been reserved against him specifically, only against his law firm, and therefore that the trustee does not have standing to assert such claims against him. First, as explained above, Fifth Circuit precedent indicates that an identification of specific defendants is not required. *See In re Texas Wyoming Drilling, Inc.*, 647 F.3d at 552. Furthermore, Stolzar is a named partner of Karlen & Stolzar, LLP. He does not dispute that he was the individual attorney for CryptoMetrics. The Amended Complaint clearly lays out his alleged involvement in the activities that are the bases of the trustee's claims. If Stolzar is implying that he was not on notice of the potential of such claims to be brought against him individually, he cannot possibly make such an argument with sincerity. If he is arguing that the creditors would not be on notice of such claims against him, the court again rejects the argument. It is sufficient that the creditors are clearly on notice of potential claims against his law firm. The breach of fiduciary duty claims are specifically and unequivocally identified and have been expressly reserved. The trustee has standing to assert the breach of fiduciary duty claims in Counts VI, VII, and XIV.

### 3.    *RICO Claims (Counts IX–XI)*

Counts IX–XI are for RICO violations under 18 U.S.C. § 1964. Count IX is a civil RICO claim against Robert Barra, Susan Barra, and Stolzar based on fraud in connection with illegal payments paid with debtor funds and misrepresentations made to fraudulently obtain financing.

Count X is a civil RICO claim against Barra, SIBS, and the ScanTech defendants based on fraud in connection with illegal payments paid through the Joint Marketing Association between the debtor and ScanTech defendants. Count XI is a RICO conspiracy claim against Barra, SIBS, and the ScanTech defendants.

The Barras, Stolzar, and the ScanTech defendants all argue that RICO was not identified or reserved as a potential cause of action, and that the reservation of claims in the Plan is an insufficient blanket reservation. Stolzar also argues the trustee lacks standing to bring claims against him because he was never identified as a potential defendant. The trustee responds that the RICO claims are based on predicate acts, including bank fraud and bribery, and that Exhibit D specifically identified fraud and unfair trade practices as potential claims against the Barras and Karlen & Stolzar. With respect to the Barras, Stolzar, and the ScanTech defendants, the trustee notes that the Disclosure Statement states that "[t]he factual allegations that form the basis of the criminal investigation shall also be the basis of potential litigation of the Post Confirmation Trust. Any and all individuals that are the subject of the criminal investigations, whether known or not presently known by the Debtor and its current representatives, are potential defendants in the claims to be asserted by the litigation trust and are hereby put on such notice." Disclosure Statement at 5 n.2. He argues that such categorical identification is sufficient.

This Court has found no precedent interpreting the *United Operating* standard for reservation of claims in the RICO context. RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. 1962(c). The following elements are essential to finding a RICO violation: "(1) the conduct (2) of an enterprise (3) through a pattern of

racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). "Racketeering activity," also known as "predicate acts" or "predicate offenses," is defined in a lengthy statutory provision which enumerates various criminal acts under both state and federal law. *See* 18 U.S.C. § 1961(1). In short, RICO claims are based on such predicate acts and cannot survive without them. The Court agrees with the trustee that reservation of the predicate offenses is enough to reserve a RICO claim based on the same offenses. This is sufficient to give notice to creditors that such claims may be brought after confirmation of a plan, whether through a state law based claim of fraud, or through a claim of a pattern of fraud conducted by an enterprise, *i.e.*, a RICO claim.

As noted above, Exhibit D specifically identifies fraud and/or unfair trade practices, of which bribery is a species, as potential claims against the Barras and Karlen & Stolzar. Again, these claims are specifically and unequivocally identified and have been expressly reserved. For the same reasons as stated above, the Court again rejects Stolzar's argument that the claims have not been reserved against him specifically. Because notice to creditors is the touchstone of the *United Operating* standard, the Court finds that the trustee has standing to assert the RICO claims against Robert Barra, Susan Barra, and Stolzar.

With respect to the RICO claims against the ScanTech defendants, the Court also finds that the trustee has standing. Potential claims and potential defendants may be categorically identified to satisfy the reservation requirement. *See In re Texas Wyoming Drilling, Inc.*, 647 F.3d at 552; *In re Diabetes Am., Inc.*, 485 B.R. 340, 345 (Bankr. S.D. Tex. 2012); *In re Crescent Res., LLC*, 463 B.R. 423, 437 (Bankr. W.D. Tex. 2011).

The Court acknowledges that the ScanTech defendants are not listed in Exhibit D and specific claims are not listed as potential causes of action against them. The Disclosure Statement, however, describes "significant sums of money" paid to agents for illegal activities which were

19

the subject of criminal investigations and that the same facts underlying the criminal investigations "shall also be the basis of potential litigation of the Post Confirmation Trust." Disclosure Statement at 5, 5 n.2. It goes on to state that "[a]ny and all individuals that are the subject of the criminal investigations . . . are potential defendants." *Id.* at 5 n.2. It specifically identifies a discrete category of potential defendants: "all individuals that are the subject of the criminal investigations." *Cf. In re Texas Wyoming Drilling, Inc.*, 647 F.3d at 552 (finding the identification of "various pre-petition shareholders of the Debtor" to be sufficient). The ScanTech defendants do not argue that they do not fall into this category of persons. The Disclosure Statement also identifies a category of potential claims: those based on payments to agents for illegal activities. *Id.* (finding that the category of "fraudulent transfer and recovery of dividends paid to shareholders" was sufficient). There are only so many claims that could be based on such activity, including RICO violations based on bribery. This is distinguishable from the "any and all" language found to be insufficient in *In re United Operating, LLC*, 540 F.3d at 356. Most importantly, this language sufficiently puts creditors on notice that such claims may be pursued post-confirmation. They would have known that any of the individuals subject to criminal investigation may be sued for the same conduct leading to the investigation.

### 4.   *Unjust Enrichment (Count XII) and Civil Conspiracy (Count VIII)*

The trustee brings a claim for unjust enrichment against the ScanTech IBS and SIBS in Count XII, who argue that this claim was not sufficiently reserved in the Plan. He also brings a claim for civil conspiracy against Barra, Vitale, Stolzar, SIBS, and the ScanTech defendants in Count VIII. They also argue that this claim was not sufficiently reserved. The Court agrees. Claims for unjust enrichment and civil conspiracy are not reserved, categorically or otherwise, in the Plan or Disclosure Statement. The trustee relies on the argument that "[o]nly the barest of

notice to creditors that such claims would be pursued post-confirmation is required," citing *In re Gulf States Long Term Acute Care of Covington, LLC*, 487 B.R. 713, 726 (Bankr. E.D. La. 2013) (finding that a plan's blanket reservation of "[a]ny and all claims and causes of action which may have been asserted by the Debtor" was sufficient), and on the policy that reservation is for providing sufficient notice to the creditors. Thus the trustee appears to argue that the reservation of "any claim or cause of action, legal or equitable, now owned or hereafter acquired by the Debtor," Plan § 1.15, sufficiently reserves claims for unjust enrichment and conspiracy. The Fifth Circuit has made clear, however, that "blanket reservations of 'any and all claims' are insufficient." *In re SI Restructuring Inc.*, 714 F.3d at 864. Therefore, the claims for unjust enrichment and conspiracy were not sufficiently reserved and the trustee does not have standing to bring them. Counts XII and VIII will be dismissed.

### 5.     *Legal Malpractice (Count XIII)*

The trustee brings legal malpractice claim against the Stolzar defendants in Count XIII. They argue that this claim has not been sufficiently reserved in the Plan. Although the trustee raises a rebuttal to the lack of standing arguments with respect to the other Counts, it does not do so with respect to Count XIII. In addition, there appears to be no specific reservation of any such malpractice claim in the Plan or the Disclosure Statement. Therefore, the Court finds that the trustee lacks standing to bring Count XIII for legal malpractice. Count XIII will be dismissed.

## V.     THE *WAGONER* RULE: STANDING TO BRING CLAIMS THAT THE STOLZAR DEFENDANTS AIDED IN DEFRAUDING A THIRD PARTY

The Stolzar defendants argue that the trustee does not have standing to bring claims that they aided in defrauding a third party, specifically, 1) allegations in Count IX that the Stolzar defendants made misrepresentations to financial institutions; 2) allegations in Count XIV that the Stolzar defendants assisted Barra and Vitale with fraudulently obtaining shareholder capital and

debt; 3) allegations in Count XIV that the Stolzar defendants assisted and permitted Barra and Vitale to execute loan documents containing falsities; and 4) allegations in Count XIV that Stolzar issued two opinion letters containing misrepresentations upon which a creditor relied. Defendant relies on the *Wagoner* rule announced by the Second Circuit in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), which states that "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation," *i.e.*, the debtor. *Id.* at 120. Therefore, defendant argues that the trustee, who stands in the shoes of the debtor, lacks standing to bring an action against it, a third party who allegedly aided the debtor in fraud.

The trustee does not appear to dispute that substantive New York law applies to his state law claims; he does argue that the *Wagoner* rule is not a matter of New York law. The Court agrees. The New York Court of Appeals has held that the *Wagoner* Rule "derives in significant part from federal bankruptcy law, and is a prudential limitation on standing under federal law." *Kirschner v. KPMG LLP*, 912 N.Y.3d 446, 459 n.3 (2010). It is "not part of New York law except as it reflects the *in pari delicto* principle, and in New York, *in pari delicto* is an affirmative defense, not a matter of standing." *Id.* Further criticism exists of *Wagoner*'s characterization of an *in pari delicto* defense as a standing issue. *See In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1003 (8th Cir. 2007); *In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, 604 F. Supp. 2d 1128, 1137–38 (S.D. Ohio 2009).

Nonetheless, other courts appear to agree with the *Wagoner* principle that a trustee standing in the shoes of a debtor lacks standing to bring claims against third parties for fraud when such claims are actually held by creditors. *See In re NM Holdings Co., LLC*, 622 F.3d 613, 624 (6th Cir. 2010) ("The key point is that 'a bankruptcy trustee has no standing generally to sue third

parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself.'"); *In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 58 (2d Cir. 2013) ("A party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' . . . This prudential limitation has been consistently applied in the bankruptcy context to bar suits brought by trustees on behalf of creditors."). Although the Fifth Circuit has not directly addressed the *Wagoner* rule specifically, district courts within this Circuit have agreed with the underlying principle. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. CIV A G-02-0299, 2007 WL 789141, at *7 (S.D. Tex. Mar. 12, 2007) ([I]f the debtor has joined a third party in defrauding creditors, the trustee does not have standing to sue the third party for damages to creditors."); *Finova Capital Corp. v. Lawrence*, No. 399CV2552-M, 2000 WL 1808276, at *2 (N.D. Tex. Dec. 8, 2000) ("[A] trustee does not have standing to pursue actions on behalf of individual creditors.").

The *Enron* case presents similar facts. In *Enron*, plaintiff Connecticut Resources Recovery Authority ("CRRA") filed three lawsuits after Enron stopped payments to CRRA in breach of an agreement and filed for chapter 11 bankruptcy protection. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 750–51 (S.D. Tex. 2005). One of the defendants named was defendant Andrews & Kurth, who served as outside general counsel to Enron during the relevant time period. *Id.* at 777. CRRA alleged that Andrews & Kurth "knowingly and intentionally aid[ed] and abett[ed] in fraudulent misrepresentations and aid[ed] and abett[ed] in negligent misrepresentations about Enron, including about its operations, performance, profitability, liquidity, debt structure, indebtedness, and debt and borrowing capacity, as issued in its financial statements and SEC filings, press releases, and publicly disseminated reports and disclosures, purportedly for the purpose of furthering Enron's illegitimate business interests and Ponzi scheme

23

to deceive the business community and investing public, including CRRA, by inflating Enron's revenue and hiding billions of dollars of its debt." *Id.* CRRA claims that it relied on such false statements in making its decision to do business with Enron and that Andrews & Kurth had violated the Connecticut Unfair Trade Practices Act. *Id.* at 777–78.

Andrews & Kurth moved to dismiss. CRRA argued "that Andrews & Kurth aided and abetted Enron in concealing debt and inflating income on its financial statements and public disclosures based on those financial statements, that CRRA relied on those financial statements and public disclosures, that CRRA suffered a direct injury while Enron, and the debtor's estate, suffered none, and thus neither Enron nor its trustee . . . could bring these claims against Andrews & Kurth." *Id.* at 797. The court, citing *Wagoner*, agreed with CRRA that it had standing, but found that "the bankruptcy trustee may not assert claims of the creditors against third parties, but only claims belonging to the debtor against third parties." *Id.* Therefore, because Andrews & Kurth's actions were "individual to and caused direct harm specific to CRRA, but not to the debtor, . . . the claim belong[ed] to the creditor, CRRA, . . . [and] neither the trustee nor the creditors' committee, both of which stand in the shoes of the debtor, ha[d] standing to assert the claim." *Id.* at 798–99.

Here, the trustee argues that Barra and Stolzar committed a RICO violation when they "made multiple misrepresentations and fraudulent statements with the intent to fraudulently obtain financing in violation of 18 U.S.C. § 1344," Am. Compl. ¶ 336 (Count IX), and that Stolzar breached his fiduciary duties to CryptoMetrics by 1) "assisting Barra and Vitale in their efforts to fraudulently obtain shareholder capital and debt financing; 2) aiding and ultimately permitting Barra and Vitale to execute the Loan Agreement and later the Reaffirmation Agreement, when he knew or should have known that the representations and warranties contained therein were false

when made and would result in default on the loan to the detriment of CryptoMetrics; and 3) by issuing the two Stolzar Opinion Letters that contained representations he knew or should have known were false when made and that he knew was a condition precedent to the finalization of the MBRO Loan," Am. Compl. ¶ 369 (Count XIV). Stolzar argues that these claims belong to creditors, not the debtor, and therefore not the trustee. The Court agrees that if the only alleged harm that occurred as a result of such activities was to the lenders of such loans and other creditors, the trustee would not have standing under the *Wagoner* principle.

As made clear by *Enron* and other cases, however, the trustee does have standing when he has alleged harm to the debtor, distinct from any harm to the creditors, as a result of the defendant's actions. *See In re Enron*, 2007 WL 789141, at *7 ("The trustee can only sue if the corporation has suffered damage distinct from the damage to the creditor."). The Court finds that the trustee has alleged such harm. Section H of the trustee's Complaint details Barra, Vitale, and Stolzar's concealment of CryptoMetrics' financial straits and attempts to fraudulently obtain funding. *See* Am. Compl. ¶¶ 258–87. With respect to Stolzar specifically, it alleges that he played an active role in securing the MBRO loan by providing advice in the negotiation of the loan terms, including relating to the execution of the loan documents containing knowingly false representations and warranties, and that he provided two opinion letters containing false representations relied upon by MBRO, and that Stolzar made similar misrepresentations in previous financing agreements. The trustee alleges that Barra and Stolzar engaged in a pattern of behavior to fraudulently finance CryptoMetrics, and that CryptoMetrics sustained a financial injury that would otherwise not have occurred. *See* Am. Compl. ¶¶ 282, 338 (Count IX), 370 (Count XIV).

The Stolzar defendants argue that these allegations only relate to harm to CryptoMetrics' creditors, *i.e.*, MBRO and other loan providers. While this section does mention harm to creditors,

it is not so limited that harm to creditors is the exclusive harm contemplated. Construing the facts in the light most favorable to the trustee, the Court finds that artificially prolonging the life of CryptoMetrics through fraudulently obtained loans would also cause harm to the company itself, separate from harm caused to the creditors providing the loans. *See Amfesco Indus., Inc. v. Greenblatt*, 568 N.Y.S.2d 593, 596 (1991) ("It has been held that 'the fraudulent inflation of the assets of a going concern with the purpose and effect of disguising its insolvency so that it will continue in a losing business is a tortious and measurable wrong to the company. For an insolvent and losing business to remain in business in disregard and in illegal concealment of the fact of its insolvency and that it has been losing money may well mean that the losses would be greater or that they are likely to be greater than if the business were terminated sooner.'"). In contrast to *Enron*, where the debtor suffered no harm as a result of its counsel's activities, *see In re Enron*, 511 F. Supp. 2d at 797–99, the trustee here has sufficiently alleged that CryptoMetrics suffered harm as a result of the Stolzar defendants' acts. Therefore, the Court concludes that the trustee has standing to assert the claims in Counts IX and XIV disputed by the Stolzar defendants. The Court will now address whether the *in pari delicto* defense bars these claims.

## VI. IN PARI DELICTO

The Stolzar defendants also argue that the doctrine of *in pari delicto* bars the trustee's state law and RICO claims. Under the *in pari delicto* doctrine, "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary (10th ed. 2014). Deriving from the Latin, *in pari delicto potior est conditio defendentis*, it means that "in a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). The doctrine is grounded in two policies: "first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an

effective means of deterring illegality." *Id.* New York recognizes the *in pari delicto* doctrine. *See Kirschner*, 15 N.Y.3d at 464. And, "New York courts have long applied the doctrine of *in pari delicto* to bar a debtor from suing third parties for a fraud in which the debtor participated." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 2016 WL 4197062, at *10 (S.D.N.Y. 2016). The Stolzar defendants therefore argue that the trustee here, who is bringing claims on behalf of CryptoMetrics, cannot seek recovery from Stolzar or Karlen & Stolzar, CryptoMetrics' attorneys, who allegedly assisted Barra, Vitale, and Shaw, *i.e.*, CryptoMetrics' management, in unlawful conduct.

The doctrine of *in pari delicto* is an issue of substance governed by state law. *See id.* at *10 n.5 ("The Plan Administrator's professional malpractice claim is brought under New York state law, and PwC's *in pari delicto* defense is correspondingly a state law defense. The application of a state law defense to state law claims is governed exclusively by state law."); *In re Greater Se. Cmty. Hosp. Corp. I*, 353 B.R. 324, 370 (Bankr. D.D.C. 2006) ("[T]he *in pari delicto* defense is a type of 'substantive' law subject to the [state's] choice-of-law rules."). Whether a plaintiff has standing to bring claims in federal court, however, is an issue of federal law. Thus, "while the perimeters of the *in pari delicto* defense are a matter of state law, the degree to which such a defense may deprive a plaintiff of standing is a matter of federal law." *Picard v. HSBC Bank PLC*, 450 B.R. 406, 410–11 (S.D.N.Y. 2011).

Under both New York state law and federal common law, *in pari delicto* is an affirmative defense. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 162 (2d Cir. 2003); *In re Lehr Constr. Corp.*, 551 B.R. 732, 739 (S.D.N.Y. 2016), *aff'd sub nom. In re: Lehr Constr. Corp.*, No. 16-350, 2016 WL 7177759 (2d Cir. Dec. 9, 2016); *Kirschner*, 15 N.Y.3d at 459 n.3. Affirmative defenses generally "must be asserted in the

defendant's answer; . . . most defensive matters cannot be the basis for a motion to dismiss the plaintiff's complaint." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1277 (3d ed. 2016). In certain circumstances, however, the application of affirmative defenses such as *in pari delicto* may be determined at the pleading stage on a motion to dismiss when the defense appears on the face of the complaint. *Id.*[3] Therefore, if, on the face of the Complaint, *in pari delicto* bars the trustee's remaining state law claim brought against the Stolzar defendants— breach of fiduciary duty (Count XIV)—and his RICO claim brought against the Stolzar defendants—Count IX—those counts are subject to dismissal at this stage.

### A.    State Law Claims for Breach of Fiduciary Duties

#### 1.    *In Pari Delicto Under New York Law*

The parties appear to agree that the state law claims in this case are governed by New York law. In New York, the *in pari delicto* doctrine exists because "denying judicial relief to an admitted wrongdoer deters illegality," and because it "avoids entangling courts in disputes between wrongdoers." *Kirschner*, 15 N.Y.3d at 464. There are exceptions, however, to its applicability. First, "[t]he 'adverse interest' exception is a method by which a plaintiff corporation can demonstrate that its agent's actions should not be imputed to it." *Symbol Techs., Inc. v. Deloitte & Touche, LLP*, 69 A.D.3d 191, 197 (N.Y. App. Div. 2009). "Traditional agency principles play an important role in an in pari delicto analysis," under which the acts of a corporation's agents are imputed to the corporation "even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud." *Kirschner*, 15 N.Y.3d at 517–19. Under the adverse interest

---

[3] New York courts take the same approach, holding that the courts may address *in pari delicto* defenses raised in motions to dismiss when its applicability is plain on the face of the complaint. *See Kirschner*, 15 N.Y.3d at 459 n.3 (stating that "in New York, *in pari delicto* is an affirmative defense, not a matter of standing," but that "*in pari delicto* may be resolved on the pleadings in a state court action in an appropriate case"); *New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Europe) B.V.*, 145 A.D.3d 16, 24 (N.Y. App. Div. 2016) (holding that the *in pari delicto* doctrine can apply at the pleading stage "where its application is 'plain on the face of the pleadings'").

exception, an agent's acts are not imputed to the corporation only when the agent has "*totally abandoned* his principal's interests and [acts] entirely for his own or another's purposes." *Id.* at 519. An agent has not totally abandoned the corporation's interest when his "fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes." *Id.* at 520.

A separate exception exists when claims are brought against corporate insiders. The *in pari delicto* doctrine is inapplicable in such circumstances. *See In re Hampton Hotel Inv'rs, L.P.*, 289 B.R. 563, 577 n.23 (Bankr. S.D.N.Y. 2003); *Glob. Crossing Estate Representative v. Winnick*, No. 04 CIV. 2558, 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006) ("[T]o the extent plaintiff can establish that defendants' alleged control and domination of GC rendered them corporate insiders and fiduciaries, *Wagoner* and the 'in pari delicto' rules will not bar plaintiff's fiduciary duty claims."); *In re KDI Holdings, Inc.*, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999); *In re Granite Partners, L.P.*, 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996). Courts have indicated that complaints must allege that individuals had a certain level of domination and control to qualify as corporate insiders and to be exempt from the *in pari delicto* defense. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094–95 (2d Cir. 1995); *In re Granite Partners, L.P.*, 194 B.R. at 332 (finding that the complaint "fail[ed] to allege the type of domination and control necessary to exclude the application of *in pari delicto*" where the defendants did not serve as officers or directors, did not coerce officers to engage in prohibited activity, and did not allege that the defendants helped prepare fraudulent materials). "General partners, sole shareholders, and sole decision makers" clearly qualify as such insiders. *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 124 (Bankr. S.D.N.Y. 2011). Importantly, however, "[e]ven a third-party professional, typically the

quintessential outsider, may surrender an *in pari delicto* defense where it exerts sufficient domination and control over the guilty corporation to render itself an insider." *Id.*

### 2.     Application of In Pari Delicto to Breach of Fiduciary Duty Claims

The trustee alleges that the Stolzar defendants breached their fiduciary duties to CryptoMetrics "by assisting Barra and Vitale in their efforts to fraudulently obtain shareholder capital and debt financing," by "counseling and providing legal services assisting Barra, Vitale, and Shaw in the usurpation of corporate assets and corporate opportunities," and by "aiding and ultimately permitting Barra and Vitale to execute the Loan Agreement and later the Reaffirmation Agreement, when he knew or should have known that the representations and warranties contained therein were false when made and would result in default on the loan to the detriment of CryptoMetrics." Am. Compl. ¶¶ 369(i)–(iii).[4]  The usurpation refers to the formation and operation of BioDentity UAE, a company owned and controlled by Barra and Shaw in their personal capacities, which the Stolzar defendants argue was done to implement CryptoMetrics' product in the UAE, but which the trustee alleges was used as a conduit for bribes and kickbacks.

The Court finds that the *in pari delicto* defense appears on the face of the Complaint, *i.e.*, that one wrongdoer, CryptoMetrics via the trustee, is seeking to recover from another, the Stolzar defendants, when CryptoMetrics' own intentional wrongdoing (through its officers) contributed to its injuries. Barra and Vitale were co-CEOs of CryptoMetrics. Their acts are "presumptively imputed" to CryptoMetrics, who is responsible for such acts even if they were unauthorized. *See Kirschner*, 15 N.Y.3d at 517–18. The trustee now stands in the shoes of CryptoMetrics, and the

---

[4] The trustee's breach of fiduciary duty claim also alleges that the Stolzar defendants breached their fiduciary duties "by issuing the two Stolzar Opinion Letters that contained representations he knew or should have known were false when made and that he knew was a condition precedent to the finalization of the MBRO Loan." Am. Compl. ¶ 369(iv). In their motion to dismiss, the Stolzar defendants only specifically address the first three breach of fiduciary duty claims in the context of the *in pari delicto* defense. The Court will not, therefore, determine whether the *in pari delicto* defense applies to the fourth claim in Count XIV, and will not dismiss that claim.

"debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative." *In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d at 63. The Complaint alleges that Stolzar acted *with* Barra and Vitale to fraudulently obtain financing for CryptoMetrics. *See* Am. Compl. 258–87. This was a fraud in which the debtor company, via its officers, participated in. In addition any usurpation accomplished via the formation of BioDentity UAE was also committed by CryptoMetrics' officers. The *in pari delicto* defense applies.

The face of the Complaint also shows that neither exception to the *in pari delicto* defense applies. First, the adverse interest exception does not apply because the Complaint contains no hint that Barra and Vitale totally abandoned CryptoMetrics' interests and were acting entirely for their own purposes when concealing CryptoMetrics' financial issues and fraudulently obtaining funding. *See Kirschner*, 15 N.Y.3d at 519. In contrast, the Complaint makes clear that they were acting to enable CryptoMetrics to survive through "new sources of shareholder capital or debt financing." Am. Compl. ¶ 258; *see also* Am Compl. ¶ 259 (describing attempts to get a loan to "bridge the gap between the many current and outstanding liabilities faced by CryptoMetrics and the purported payments that would be received"). Because, as alleged by the Complaint, Barra and Vitale acted to "raise funds for corporate purposes," the adverse interest exception does not apply. *See Kirschner*, 15 N.Y.3d at 520. In addition, with respect to usurpation, the Complaint claims that the formation of BioDentity UAE was for the purpose of facilitating efforts to market CryptoMetrics' products in the Middle East. Am. Compl. ¶ 6. Again, this indicates that it was done to benefit CryptoMetrics, and therefore the adverse interest exception does not apply.

In addition, the face of the Complaint shows that the corporate insider exception to the *in pari delicto* defense does not apply. It is true that third party professionals, such as outside counsel, may qualify as insiders for the purpose of this exception. *See In re Bernard L. Madoff Inv. Sec.*

*LLC*, 458 B.R. at 124. The Complaint here, however, contains no allegations that the Stolzar defendants had such domination or control over CryptoMetrics to be considered "insiders." Therefore, the corporate insider exception does not apply.

In sum, because applicability of the *in pari delicto* defense to parts of the trustee's breach of fiduciary duty claim is apparent on the face of the Complaint, the Court will dismiss parts of Count XIV. Specifically, the Court will dismiss the claims that the Stolzar defendants breached their fiduciary duties by assisting Barra and Vitale in their efforts to fraudulently obtain shareholder capital and debt financing, by counseling and providing legal services assisting Barra, Vitale, and Shaw in the usurpation of corporate assets and corporate opportunities, and by aiding in the execution of the fraudulent loan agreement. *See* Am. Compl. ¶ 369(i)–(iii). Because the defendants did not specifically raise an *in pari delicto* defense to the fourth claim in Count XIV, it remains.[5]

### B.   Civil RICO Claim

*In pari delicto* is also a defense to civil RICO claims. *Rogers v. McDorman*, 521 F.3d 381, 389 (5th Cir. 2008). Under federal law, the *in pari delicto* defense is available "where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the [federal law]." *Bateman Eichler*, 472 U.S. at 310–11; *see also Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1154 (11th Cir. 2006) ("[T]he application of the defense of *in pari delicto* to causes of action created by federal statutes depends on two factors: (1) the plaintiffs' active participation in the violation *vel non* and (2) the

---

[5] Defendant SIBS raises an *in pari delicto* defense to the trustee's RICO claims for the first time its reply brief. "Arguments raised for the first time in a reply brief are generally waived." *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). The Court will not address defendant SIBS' *in pari delicto* defense.

policy goals of the federal statute."); *Rogers*, 521 F.3d at 389 (citing *Edwards* with approval). "The first prong of this test captures the essential elements of the classic *in pari delicto* doctrine. The second prong, which embodies the doctrine's traditional requirement that public policy implications be carefully considered before the defense is allowed, ensures that the broad judge-made law does not undermine the congressional policy favoring private suits as an important mode of enforcing federal securities statutes." *Pinter v. Dahl*, 486 U.S. 622, 633 (1988) (internal citations omitted).

The civil RICO claim brought against Stolzar in Count IX alleges that "Barra and Stolzar made multiple misrepresentations and fraudulent statements with the intent to fraudulently obtain financing in violation of 18 U.S.C. § 1344," which prohibits bank fraud. Am Compl. ¶ 336. This allegation refers again to the situation surrounding the obtainment of the MBRO loan, during which Stolzar allegedly corroborated Barra's and Vitale's fraudulent statements and made further fraudulent statements to investors and lenders. The Court finds that the Stolzar defendants have demonstrated that *in pari delicto* is evidently applicable to the RICO claim on the face of the Complaint.

First, the Complaint explains how Barra and Vitale, the CEOs of CryptoMetrics, worked with Stolzar to obtain the MBRO loan and other fraudulent financing. The Court concludes that the debtor company CryptoMetrics, through the acts of its agent Barra, bears equal responsibility for the RICO violation it now seeks to redress. *Cf. Edwards*, 437 F.3d at 1155 (finding that it was "beyond doubt that the allegations of the trustee's complaint render [the debtor company] in active participation with the [defendant bank and trust companies]" when the debtor company devised and controlled a Ponzi scheme and the defendants "enabled thousands of investors to partake of the [debtor] scheme and caused [the debtor] to incur millions of dollars in additional debt").

The trustee argues that it would be inequitable to apply the wrongdoer label to the trustee and that the bad acts of CryptoMetrics' agents—Barra and Vitale—should not be imputed to the company itself. It is clear, however, that the trustee, although himself an innocent actor, stands in the shoes of the debtor company. *See Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("[T]he trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition); *Stanley v. Trinchard*, 500 F.3d 411, 425 (5th Cir. 2007). Any misconduct by the debtor company is therefore imputed to the trustee as the debtor company's representative. *See In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d at 63. Furthermore, the trustee has not shown that the acts of Barra and Vitale in this context—*i.e.*, their attempts to fraudulently obtain financing for CryptoMetrics—should not be imputed to the company. With respect to the MBRO loan and other attempts to obtain financing, there is no indication that Barra and Shaw were acting adversely to the interests of CryptoMetrics.[6] *See Kirschner*, 15 N.Y.3d at 519–20; *see also Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1354 (11th Cir. 2008). As explained above, it appears instead that Barra and Vitale were attempting to obtain financing in order to allow CryptoMetrics to survive or to prolong its life. *See Kirschner*, 15 N.Y.3d at 520; *cf. Renta*, 530 F.3d at 1355 (finding that the *in pari delicto* defense failed when there was evidence that the president and majority owner of the company looted and stole from the company because such acts could not be imputed to the company).

---

[6] Courts "look to state law to ascertain when wrongful conduct should be imputed to a corporation." *Nisselson v. Lernout*, 469 F.3d 143, 154 (1st Cir. 2006) (citing *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 84 (1994)). There appears to be no disagreement that New York law applies here. As the Court previously explained, in New York, an agent's acts are not imputed to the corporation when the agent has "*totally abandoned* his principal's interests and [acts] entirely for his own or another's purposes." *Kirschner*, 15 N.Y.3d at 519. An agent has not totally abandoned the corporation's interest when his "fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes." *Id.* at 520.

With regard to the second prong of *Bateman Eichler*, courts, including the Fifth Circuit, have found that the policy concerns underlying civil RICO do not preclude use of the *in pari delicto* defense:

> Congress intended RICO's civil remedies to help eradicate organized crime from the social fabric by divesting the association of the fruits of ill-gotten gains. Allowing [the plaintiffs, former directors of a bank who actively participated in check-kiting scheme] to recover under RICO would not divest RICO violators of their ill-gotten gains, rather it would let plaintiffs found by a jury to bear substantially equal responsibility for their injuries to recover damages . . . . This is not a situation where an innocent or passive victim is being deprived of a RICO remedy. We do not think Congress intended RICO to facilitate a wealth transfer among similarly situated conspirators; indeed, countenancing such a wealth transfer would, perversely, reward conspirators with treble damages—and that hardly seems to further RICO's deterrence goals.

*Rogers*, 521 F.3d at 391 (internal citations and quotation marks omitted); *see also Republic of Iraq v. ABB AG*, 768 F.3d 145, 167 (2d Cir. 2014); *Edwards*, 437 F.3d at 1155–56. There is no persuasive argument that different policy concerns are applicable here.

Therefore, because the *in pari delicto* defense precludes the trustee's RICO claim against the Stolzar defendants, the Court will dismiss Count IX against Stolzar and Karlen & Stolzar.[7]

## VII.   PERSONAL JURISDICTION OVER SIBS

Defendant SIBS argues that this Court lacks personal jurisdiction—either general or specific—over it because it is a Delaware limited liability company with minimum contacts within the United States, but no minimum contacts with the State of Texas, and therefore it should be dismissed from this action. The trustee argues that the Court has personal jurisdiction over SIBS pursuant to Federal Rule of Bankruptcy Procedure 7004. It does not argue that SIBS has sufficient

---

[7] Because the Court concludes that Count IX will be dismissed on *in pari delicto* grounds, it need not reach the Stolzar defendants' arguments that the trustee's RICO claim is barred because only a bank has standing to allege bank fraud under 18 U.S.C. § 1344 as a predicate act for RICO purposes, and because the lenders were not "financial institutions" under federal law. The Court notes, however, that it has in fact determined that only a bank has standing to allege this claim in response to a different defendant's motion to dismiss.

minimum contacts with the State of Texas.  The Court finds that it has personal jurisdiction over defendant SIBS.

### A.    Legal Standards

Federal Rule of Bankruptcy Procedure 7004(d) provides for nationwide service of process. Fed. R. Bankr. Proc. 7004(d).  Federal Rule of Bankruptcy Procedure 7004(f) provides that service of a summons "is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code." Fed. R. Bankr. Proc. 7004(f).  Where, as here, "a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994).

### B.    Analysis

Defendant SIBS concedes that it has minimum contacts within the United States, and there appears to be no dispute regarding service.  Therefore, the only question is whether Rule 7004(f) applies, that is, whether this is a case is one under the Bankruptcy Code or is a civil proceeding arising under the Bankruptcy Code, or arises in or is related to a case under the Bankruptcy Code.

In contrast to defendant SIBS's contention that this Court ruled that the Amended Complaint and the causes of action are not causes of action arising under the Bankruptcy Code, and therefore that it withdrew the standing of the reference, the Court made no such finding.  It merely found that SIBS's motion to withdraw the reference had merit.  *See* Order Granting ScanTech Identification Beam Systems, LLC's Motion to Withdraw the Reference, No. 12-5115,

ECF No. 145 (Bankr. W.D. Tex. Sept. 9, 2013). The Motion itself raised several grounds for withdrawal, including lack of jurisdiction, mandatory withdrawal, and discretionary withdrawal.

The remaining claims brought against SIBS are for civil RICO violations (Count X) and for RICO conspiracy (Count XI). As explained in detail above, this Court has found that it has subject matter jurisdiction over such claims because they are related to the debtor's bankruptcy case. Therefore, Rule 7004(f) applies. Because defendant SIBS has conceded that it has minimum contacts with the United States, this Court has personal jurisdiction over it in this case.

## VIII. SUFFICIENCY OF PLEADINGS

Beyond the aforementioned jurisdictional issues, the defendants also argue that the trustee has failed to sufficiently state a claim and the complaint should be dismissed under Rules 12(b)(6) and 9. Defendants Robert Barra, Susan Barra, and Michael Vitale argue that the trustee has failed to state the claims brought against them in Counts I–XI. Defendant SIBS argues that the trustee has failed to state the claims brought against it in Counts VIII, X–XII. It argues specifically that it is the pleadings are based only on "information and belief" and fail to overcome a presumption of successor non-liability. The Court has already determined that the trustee does not have standing to bring the claims in Counts VIII and XII. Therefore, it will only determine whether the trustee has properly pled the claims in Counts I–VII and IX–XI.

### A. Legal Standards

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Instead,

the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

Fraud claims are subject to the heightened pleading standard in Rule 9(b), under which "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). Simply put, the plaintiff must lay out "the who, what, when, and where" of each fraud claim. *Id.* at 178.

Rule 9(b) applies to "RICO claims resting on allegations of fraud." *Id.* at 177. When the predicate acts of a RICO claim do not involve fraud, however, Rule 9(b) does not apply. *Varela v. Gonzales*, No. 3:13-CV-1278-B, 2013 WL 5658606, at *3 (N.D. Tex. Oct. 17, 2013). Rule 9(b) also does not apply to claims for constructive fraud, as opposed to actual fraud. *See In re Crescent Res., LLC*, No. 09-11507-CAG, 2012 WL 195528, at *7 (Bankr. W.D. Tex. Jan. 23, 2012) ("Rule 9(b) does not apply to claims for avoidance of constructively fraudulent transfers because such claims are not based on actual fraud but instead rely on the debtor's financial condition and the sufficiency of consideration provided by the transferee." (internal quotation marks omitted)); *In re NE 40 Partners, Ltd.*, 411 B.R. 352, 365 n.9 (Bankr. S.D. Tex. 2009). Finally, Rule 9(b) does not apply to breach of fiduciary duty claims unless such claims rest on claims of fraudulent conduct. *See In re NE 40 Partners*, 411 B.R. at 363.

**B.     Analysis**

*1.     Fraudulent Transfers: Actual Fraud (Counts I–II)*

Counts I and II allege that CryptoMetrics made unwarranted payments to the Barras, the Yaqubs, and Vitale with the actual intent to hinder, delay, or defraud creditors. The trustee seeks to avoid such payments under the New York Uniform Fraudulent Conveyance Act or 11 U.S.C. § 548. Section 276 of the New York Uniform Fraudulent Conveyance Act provides that "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. 11 U.S.C. § 548 allows the trustee to avoid any transfers made with actual fraudulent intent, 11 U.S.C. §548(a)(1)(A), or where the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and was insolvent on the date of the transfer, 11 U.S.C. § 548(a)(1)(B).

The Court finds that the trustee has sufficiently pled with particularity the fraudulent transfer claims in Counts I and II. Exhibits A and B to the Complaint list the allegedly fraudulent transfers made to the Barras and to Vitale. *See* Am. Compl. Exs. A, B. They list to whom the transfer was made, the date of the transfer, the check number (where applicable), and the monetary amounts. Defendants' argument that there is no discussion of the nature of the payments or what the payments were made for is clearly belied by the Complaint. The trustee has alleged that these payments were made for personal use of the Barras and Vitale, such as for luxury automobiles, cell phone bills, utility bills, and parking violations, and did not reflect compensation for employment with or work performed on behalf of CryptoMetrics. *See* Am. Compl. ¶¶ 250–53, 300–01, 306–07.

Furthermore, the trustee has sufficiently pled the scienter requirement of actual intent. Even in fraud claims, intent "may be alleged generally." Fed. R. Civ. P. 9(b). The trustee alleges that the "payments were made with the actual intent to hinder, delay, or defraud" creditors as evidenced by the following badges of fraud: 1) the transfers were to insiders of the CryptoMetrics; 2) CryptoMetrics received less than reasonably equivalent value in return; 3) CryptoMetrics was insolvent at the time of each transfer; 4) the defendants knew or should have known of CryptoMetrics inability to pay creditors; and 5) the transfers were not made as part of CryptoMetrics' usual course of business. Am. Compl. ¶¶ 291, 295. Alleging such "badges of fraud" is sufficient to plead actual intent. *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 672 (N.D. Tex. 2011); *In re Boyd*, No. ADV 12-05107, 2012 WL 5199141, at *9 (Bankr. W.D. Tex. Oct. 22, 2012). The factual allegations in the Complaint further support the allegations of the badges of fraud. Therefore, the Court finds that the trustee has sufficiently pled his claims of actual fraudulent transfers in Counts I and II.

### 2. *Fraudulent Transfers: Constructive Fraud (Counts III–IV)*

Counts III and IV allege that CryptoMetrics made unwarranted payments to the Barras, the Yaqubs, and Vitale for nothing of commensurate value in return while CryptoMetrics was either insolvent or severely undercapitalized, and at the same time unsecured creditors existed as to whom the payments were fraudulent. The trustee seeks to avoid such payments under the New York Uniform Fraudulent Conveyance Act or 11 U.S.C. § 548. Section 273 of the New York Uniform Fraudulent Conveyance Act provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration," N.Y. Debt. & Cred. Law § 273. Section 275 provides that "[e]very

conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 275.   11 U.S.C. § 548 allows the trustee to avoid any transfers made where the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and was insolvent on the date of the transfer.  11 U.S.C. § 548(a)(1)(B).  Because these are claims are based on constructive fraud, the heightened pleading standards of Rule 9(b) do not apply.  *See In re Crescent Res., LLC*, 2012 WL 195528, at *7.

Defendants argue that the trustee has made only conclusory allegations that CryptoMetrics was insolvent, or became insolvent as a result of the payments, that it received less than reasonably equivalent value in exchange for the transfers, and that other unsecured creditors existed and CryptoMetrics was unable to pay its debts as they became due.  Again, however, defendants' arguments are belied by the detailed Complaint.  The trustee has alleged the following facts demonstrating insolvency, under a heading aptly labelled "CryptoMetrics Operated in Perpetual Insolvency": 1) close examination of CryptoMetrics' financial statements demonstrate that it was insolvent as of the close of the fiscal year on April 30, 2004; 2) CryptoMetrics was unable to develop any substantial or sustained revenue after the purchase of CCI in 2004 and had accumulated a retained deficit of $28 million by the close of fiscal year 2006/07; 3) as early as January 1, 2004, CryptoMetrics was unable to pay officer salaries; 4) beginning in 2004, CryptoMetrics frequently failed to pay invoices when due or was forced to make partial payments;[8] 5) CryptoMetrics was dependent on efforts to continually attract infusions of shareholder capital

---

[8] Defendants also argue that the "Complaint only alleges that there were other unsecured creditors that existed and that Cryptometrics was unable to pay its debts as they became due."  The allegations listed at numbers 3 and 4 contradict such an assertion and support the trustee's claims of insolvency.

or other debt financing.  Am. Compl. ¶¶ 33–44.  These facts, taken as true, establish that CryptoMetrics was insolvent by 2004.  The allegedly fraudulent payments to the Barras and Vitale began in 2004, and the allegedly fraudulent payments to the Yaqubs began in 2007.  There is no indication in the Complaint that CryptoMetrics later became solvent.  The trustee has sufficiently alleged that the payments were made when CryptoMetrics was insolvent.

In addition, the Complaint sufficiently alleges that CryptoMetrics received less than reasonably equivalent value in exchange for the transfers.  The Complaint alleges that the defendants provided no additional services or other consideration above and beyond their normal job functions in exchange for the payments.  Am. Compl. ¶¶ 301, 307.   It also alleges that the payments were made for personal use of the Barras and Vitale, such as for luxury automobiles, cell phone bills, utility bills, and parking violations.  *Id.* ¶¶ 250–53.  Therefore, the trustee has sufficiently alleged facts showing that CryptoMetrics was insolvent at the time of the transfers and unable to pay its debts, and that CryptoMetrics received less than a reasonably equivalent value in exchange for the transfers or that the transfers were made without consideration.  The trustee has sufficiently pled his claims for constructively fraudulent transfers.  *Cf. In re PMB Prop. Mgmt., Inc.*, No. ADV.10-3012-C, 2010 WL 2179688, at *3 (Bankr. W.D. Tex. May 25, 2010) (finding that a fraudulent transfer claim was adequately pled when the complaint alleged that an interest in property was transferred, that an obligation was incurred, that the company was not solvent at the time, and that no consideration passed).

### 3.   *Recovery of Fraudulent Transfers (Count V)*

Count V is brought pursuant to 11 U.S.C. § 550 to recover the allegedly fraudulent transfers described in Counts I–IV.  Defendants argue that because recovery of a transfer under 11 U.S.C. § 550 is dependent upon recovery under § 544 or § 548, Count V must be dismissed.  As the Court

has just found that the trustee has adequately stated claims for fraudulent transfer in Counts I–IV, this argument is without merit.  Count V will not be dismissed.

### 4.      *Breach of Fiduciary Duties (Counts VI–VII)*

The trustee brings Count VI for breach of fiduciary duties against defendants Barra, Vitale, and Shaw, alleging that the defendants received improper personal benefits, diverted corporate opportunities, wasted corporate assets, and intentionally engaged in illegal and tortious conduct in breach of the fiduciary duties of care and loyalty owed as officers and/or directors of CryptoMetrics.  Count VII alleges that defendant Susan Barra, with full knowledge and awareness of the aforementioned misconduct, provided substantial assistance to the other defendants in committing such breaches of their fiduciary duties by utilizing her control of CryptoMetrics' bank accounts and finances to divert corporate assets for the defendants' personal use, wire funds for illegal bribes, and conceal the other defendants' breaches of their fiduciary duties.

The elements of a breach of fiduciary claim in New York are "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Smallwood v. Lupoli*, 107 A.D.3d 782, 784 (N.Y. App. Div. 2013).  To allege that an individual aided and abetted a breach of fiduciary duty a plaintiff must allege "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (N.Y. App. Div. 2003).  The plaintiff must allege that the defendant had actual knowledge of the breach. *Id.*  In addition, "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.* at 126.

Contrary to defendants' arguments, none of the alleged breaches of fiduciary duties are predicated on fraud. Although the trustee describes various acts of fraud committed by Barra and Vitale throughout the Complaint, the breach of fiduciary duty claim is predicated on various instances of waste, self-dealing, usurpation of corporate opportunities for personal benefit, usurpation of corporate funds for illegal purposes, diversion of corporate assets for personal use, and failure to implement adequate controls. Therefore, the heightened pleading standards of Rule 9(b) do not apply. *See In re NE 40 Partners*, 411 B.R. at 363.

Furthermore, the trustee has sufficiently stated a claim for breach of fiduciary duties against Robert Barra and Michael Vitale, and a claim for aiding and abetting breach of fiduciary duties against Susan Barra. Defendants Robert Barra and Michael Vitale, as co-CEOs of CryptoMetrics, obviously owed fiduciary duties to CryptoMetrics. The Complaint alleges that they engaged in the various forms of misconduct described above. Specifically, they engaged in waste of corporate assets by pursuing then abandoning the JAG Media merger and by repeatedly relying upon untrustworthy foreign agents for the purposes of making illegal payments to foreign officials and businessmen. Am Compl. ¶ 316(a)–(b). It alleges that the defendants breached their duty of loyalty by pursuing and then abandoning the JAG Media merger, engaging in self-dealing, using corporate funds for illegal purposes, and diverting corporate assets for personal use. *Id.* ¶ 316(a), (c)–(f). Exhibits A and B to the Complaint contain detailed lists of allegedly fraudulent transfers to the Barras and Vitale in support of the allegation that they misappropriated CryptoMetrics' assets for personal use. *See* Am. Compl. Exs. A, B. Exhibit C contains a detailed list of payment made from CryptoMetrics to the Yaqubs, who were allegedly foreign agents used to facilitate bribe to UAE officials. *See* Am. Compl. Ex. C. The Complaint describes how Barra and Shaw formed and sustained BioDentity Systems, LLC using CryptoMetrics' funds, but owned it in their personal

capacities and used it as a conduit for bribes and kickbacks. *See* Am. Compl. ¶ 6. It alleges that the defendants breached the duty of care by failing, in bad faith, to implement adequate internal controls. *Id.* ¶ 316(g). Finally, it alleges that as a result of such breaches, CryptoMetrics sustained significant financial injury, effectively dooming the company. "In every year of its existence, CryptoMetrics generated little to no revenue, and what it did receive was substantially less than its expenditures." *Id.* ¶ 9. The Court finds that the trustee has sufficiently stated a claim for breach of fiduciary duties in Count VI.

The trustee has also sufficiently alleged that defendant Susan Barra aided and abetted the breaches. Defendants only appear to argue that the trustee has not sufficiently pled the "misconduct" element of a breach of fiduciary duty claim, and therefore has not pled the "breach by a fiduciary of obligations to another" element of an aiding and abetting claim. Because the Court has just found that the trustee sufficiently pled his breach of fiduciary duty claim, specifying the misconduct of defendants Barra and Vitale, it also finds that the trustee has sufficiently pled the aiding and abetting claim brought against Susan Barra in Count VII.

Defendants alternatively asks the Court to require the trustee to replead with a more definite statement of what events constitute breaches of fiduciary duties. "A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Defendants argue that the trustee has failed to provide "fair notice" of his claims, failing to discuss what activities constitute a breach of fiduciary duties and making it "virtually impossible to know which allegations of fact support which claim(s) for relief." *See Anderson v. Dist. Bd. of Trustees of Cent. Florida Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). The Court will deny this motion.

As explained above, the actions constituting misconduct are listed in Count VI and explained throughout the Complaint. The defendants are on fair notice of the trustee's claims.

### 5.    *RICO (Counts IX–XI)*

Counts IX–XI are brought under the civil RICO statute, 18 U.S.C. § 1964(c). Count IX alleges that the Barras and Shaw directed employees to make multiple international or interstate trips for the purpose of facilitating illegal bribes to foreign officials, and/or transferred, through international wire, funds to facilitate such bribes in violation of 18 U.S.C. § 1952. It also alleges that Barra and Stolzar made misrepresentations and fraudulent statements with the intent to fraudulently obtain financing in violation of 18 U.S.C § 1334. Count X alleges that ScanTech Holdings, ScanTech IBS, and CryptoMetrics formed the Joint Marketing Association for the purpose of pursuing business in the Middle East and Barra, Shaw, Yaqub, ScanTech Holdings, and ScanTech IBS directed employees to make multiple international or interstate trips for the purpose of facilitating illegal bribes to foreign officials, and/or transferred, through international wire, funds to facilitate such bribes in violation of 18 U.S.C. § 1952. It alleges that SIBS is liable for the actions of ScanTech IBS. Finally, Count XI alleges that defendants Barra, Shaw, Yaqub, ScanTech Holdings, and ScanTech IBS conspired to violate RICO, mutually agreeing to conduct the affairs of the Joint Marketing Association through a pattern of racketeering activity.

The defendants raise arguments that must be addressed before the Court determines whether the RICO claims are adequately pled under Rule 12(b)(6) or Rule 9(b). First, the Barras and Vitale argue that Count IX asserts a violation of 18 U.S.C. § 1344, which prohibits bank fraud, but that only a financial institution can assert such a claim. Second, Defendant SIBS, which was formed after ScanTech IBS allegedly committed the acts relevant to this lawsuit, argues that the trustee's claims against it are dependent on a theory of successor liability to ScanTech IBS, but

that the trustee has failed to overcome the presumption of successor non-liability.   The Court will address these arguments then will determine whether the trustee has adequately alleged RICO violations against each defendant.

a)      <em>Standing to Assert Claims Based on Bank Fraud</em>

RICO lists bank fraud as an example of "racketeering activity."  18 U.S.C. § 1961(1).  The bank fraud statute prohibits defrauding a financial institution or obtaining money, etc. from a financial institution by means of fraud.  18 U.S.C. § 1344.  In Count IX, the trustee alleges that Barra and Stolzar made misrepresentations and fraudulent statements with the intent to fraudulently obtain financing in violation of the bank fraud statute. Am. Compl. ¶ 336.  The Barras and Vitale ask that paragraph 336 be stricken because only a financial institution can assert a claim of bank fraud as a RICO predicate act.

The Fifth Circuit has not specifically addressed the issue of whether a non-bank has standing to assert a claim of bank fraud in the context of a RICO predicate act.  Many other district courts, including some within the Fifth Circuit, have, however, addressed this question and have found that only financial institutions may claim bank fraud as a RICO predicate act.  *See, e.g., B Choice Ltd. v. Epicentre Dev. Assocs. LLC*, No. CV H-14-2096, 2016 WL 3911123, at *13 (S.D. Tex. May 12, 2016), *report and recommendation adopted sub nom. Ltd. v. Epicentre Dev. Assocs., LLC*, No. CV H-14-2096, 2016 WL 3763268 (S.D. Tex. July 14, 2016); *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 735 F. Supp. 2d 679, 696–97 (S.D. Tex. 2010); *Am. Biocare, Inc. v. Howard & Howard Attorneys, PLLC*, No. 14-CV-14464, 2016 WL 5661583, at *8 (E.D. Mich. Sept. 30, 2016); *Nelson v. Nelson*, No. CIV. 14-4854, 2015 WL 4136339, at *7 (D. Minn. July 8, 2015), *aff'd*, 833 F.3d 965 (8th Cir. 2016); *Holland v. Cerberus Capital Mgmt.*, No. 2:13-CV-00491, 2014 WL 6473479, at *8 (N.D. Ind. Nov. 18, 2014); *W. & S. Life Ins. Co. v. JPMorgan Chase Bank,*

*N.A.*, 54 F. Supp. 3d 888, 917 (S.D. Ohio 2014); *GSAA Home Equity Trust 2006-2 ex rel. LL Funds LLC v. Wells Fargo Bank, N.A.*, 133 F. Supp. 3d 1203, 1227 (D.S.D. 2015).

The trustee argues that because standing to bring a civil action under RICO is broad—providing that "Any person injured" may bring suit, 18 U.S.C. § 1964(c)—and RICO is to be "liberally construed to effectuate its remedial purposes," *Boyle v. United States*, 556 U.S. 938, 944 (2009), the Court should find that the trustee has standing to assert bank fraud as a predicate act under RICO even though the plaintiff is not a financial institution. The trustee also cites to three cases which purportedly stand for the proposition that non-banks have standing to allege bank fraud as a predicate act in RICO cases. *See Martinez v. Creative Concepts, Inc.*, No. 2:12-CV-277 JCM PAL, 2012 WL 4490946 (D. Nev. Sept. 27, 2012); *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070 (C.D. Cal. 2011); *Finch v. Finch*, No. 08-CV-408-JPG, 2009 WL 310776 (S.D. Ill. Feb. 9, 2009).

These cases do not convince the Court to decide against the weight of opinions that have held that only banks have standing to assert such claims. First, in *Hill*, although the court found that "[t]he fact that banks are the intended victims of the bank fraud statute, however, does not categorically mean that plaintiffs who were otherwise injured as a result of bank fraud cannot assert claims under RICO" given the structure of the civil RICO statute, *Hill*, 841 F. Supp. 2d at 1098, it also found that "the standing requirement effectively accounts for the causation and injury elements of a RICO claim." *Martinez*, 2012 WL 4490946, at *5 (citing *Hill*, 841 F. Supp. 2d at 1098). First, with respect to the injury element, because "plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory standing," *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168–69 (9th Cir. 2002), "[t]he presence of a more direct victim [*i.e.*, the bank] thus weighs strongly against a finding that plaintiffs can assert a RICO claim based on bank fraud." *Hill*, 851 F. Supp. 2d at 1098. Second, the *Hill* court found that "[p]laintiffs' bank

fraud allegations also fail adequately to plead causation due to the uncertainty inherent in determining damages attributable to the wrongful conduct," and therefore that the plaintiffs lacked standing to assert RICO claims based on bank fraud. *Id.* at 1098–99. As noted above, the *Martinez* court cited to this part of the *Hill* decision and found that the plaintiff had not adequately pled proximate cause. *Martinez*, 2012 WL 4490946, at *5.

Finally, the *Finch* opinion is not a strong advocate of affording standing to non-banks for bank fraud claims. Although the defendant argued "that the plaintiffs have no standing because they were not the victims of the bank frauds alleged as a predicate act to their civil RICO claim," the court appears to have rejected that argument only because of the defendant's misplaced reliance on a Seventh Circuit case which "dismissed the plaintiff's civil RICO action not because bank fraud cannot support an individual's civil RICO claim but because the plaintiff in that case had not alleged a fraud on a bank." *Finch*, 2009 WL 310776, at *4 (citing *Bressner v. Ambroziak*, 379 F.3d 478, 482 (7th Cir. 2004)). The court concluded that "*Bressner* has no application to this case, where the plaintiffs have clearly alleged that [the] defendants participated in a scheme to defraud financial institutions by presenting forged documents in order to gain control over assets in custody of those institutions." *Id.* It did not address any cases similar to those cited above that have found that only banks have standing to allege bank fraud as a predicate act.

In sum, the large majority of courts to directly address the issue of whether non-banks may allege bank fraud as a predicate act in the RICO context have found that such individuals or entities do not have standing to do so. The trustee has not presented controlling caselaw concluding otherwise and the cases he presented do not convince this Court do decide against the weight of authority. The trustee may not allege bank fraud as a predicate act for his RICO claims. Paragraph 336 shall be stricken from the Complaint.

*b)*      *Successor Liability of SIBS*

The trustee alleges that ScanTech Holdings, ScanTech IBS, and SIBS are all liable for the UAE bribery scheme and for the actions of defendants Yaqub and Dagher, ScanTech executives who were introduced to CryptoMetrics by the ScanTech Entities and who acted as agents who were used to facilitate bribes to UAE officials. The trustee alleges that on May 13, 2011 ScanTech Holdings caused the formation of a new subsidiary, SIBS, "which upon information and belief was specifically formed to continue the business of ScanTech IBS subsequent to the assertion of claims arising out of the operations of that company." Am. Compl. ¶ 5 n.2. Thus, the trustee argues that SIBS is liable as the successor to ScanTech IBS.

*(1)*      *Choice of Law*

To determine whether successor liability exists, the Court must first determine which state's laws apply. SIBS is a registered to do business in Delaware and Georgia with offices in Georgia. ScanTech Holdings is a Delaware limited liability company and ScanTech IBS is a Virginia limited liability company. When faced with a choice of law issue, "Texas courts use the ALI Restatement's 'most significant relationship test' for all choice of law cases except those contract cases in which the parties have agreed to a valid choice of law clause." *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 (5th Cir. 2000). The trustee argues that Virginia law applies because the state of incorporation of the predecessor corporation, *i.e.*, ScanTech IBS, has the greatest interest in having its successor liability laws applied. *See Nat'l Architectural Prod. Co. v. Atlas-Telecom Servs.--USA, Inc.*, No. CIV.A. 306CV0751-G, 2007 WL 2051125, at *12–13 (N.D. Tex. July 13, 2007). SIBS argues that because the only connection to Virginia is the fact that it is the state of incorporation of ScanTech IBS, and because the purchase agreement between ScanTech IBS and SIBS made Delaware the choice of law that would govern the agreement.

The Court finds that Delaware law of successor liability applies. The issue here is whether the asset purchase agreement created successor liability sufficient to render SIBS a successor to ScanTech IBS' liabilities to CryptoMetrics. *See id.* at *11. The asset purchase agreement, which is the central focus of the successor liability inquiry, created SIBS as a Delaware corporation and explicitly provides that it is governed by Delaware law. "Under Texas law, the buying and selling corporations' purchase agreement's choice of law provision controls the applicability of successor liability doctrines." *Ford, Bacon & Davis, LLC v. Travelers Ins. Co.*, No. CIV.A. H-08-2911, 2010 WL 1417900, at *5 (S.D. Tex. Apr. 7, 2010), *aff'd sub nom. Ford, Bacon & Davis, L.L.C. v. Travelers Ins. Co.*, 635 F.3d 734 (5th Cir. 2011). Given these contractual terms in the asset purchase agreement and that the only connection to Virginia is that it is the predecessor entity was incorporated there, the Court finds that Delaware law applies to the issue of successor liability. *See White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 771 (E.D. Tex. 2002) (finding that Vermont law applied to the issue of successor liability in part because the purchase agreement made Vermont law the choice of law that would govern the agreement); *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 133–34 (Tex. App. 2000) (applying Delaware law to successor liability where the purchase and sale agreement specified Delaware in its choice of law provision and where Delaware had "a reasonable relationship to the sale of [the predecessor's] assets").

### (2)     *Successor Liability Under Delaware Law*

Under Delaware law, "when one company sells or otherwise transfers all of its assets to another company, the buyer generally is not responsible for the seller's liabilities, including claims arising out of the seller's tortious conduct." *Ross v. Desa Holdings Corp.*, No. CIV A 05C-05-013, 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008). Successor liability—where the buyer company is liable for the acts of the seller—may exist, however, in the following

circumstances: "(1) the buyer's assumption of liability; (2) defacto merger or consolidation; (3) mere continuation of the predecessor under a different name; or (4) fraud," the first two of which are inapplicable in this case. *Id.* The "mere continuation" theory is narrowly construed by Delaware courts and "requires that the new company be the same legal entity as the old company. The test is not the continuation of the business operation; rather, it is the continuation of the corporate entity. Imposition of successor liability is appropriate only where the new entity is so dominated and controlled by the old company that separate existence must be disregarded." *Id.* (internal quotation marks omitted); *see also Fountain v. Colonial Chevrolet Co.*, No. C.A. 85C-DE-88, 1988 WL 40019, at *8–9 (Del. Super. Ct. Apr. 13, 1988) (for the new company to be a mere continuation, "it must be the same legal person, having a continued existence under a new name."). To determine whether the new company is the same legal entity, courts consider the following elements: "the common identity of the officers, directors, or stockholders of the predecessor and successor corporations, and the existence of only one corporation at the completion of the transfer." *Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, No. CIV.A. S11C-04013ESB, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011).

Delaware also allows for successor liability in cases of fraudulent transfer. *See Ross*, 2008 WL 4899226, at *4. Transfers are fraudulent if made "with actual intent to hinder, delay or defraud any creditor of the debtor," or "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor" was engaged in a business "for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or the debtor "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." 6 Del. C. § 1304(a).

The Court first rejects the defendants' argument that the "information and belief" pleadings are not sufficient to support a claims against SIBS. "Although there is no express authorization in the federal rules for pleading on information and belief, allegations in this form have been held to be permissible," and are often a "practical necessity." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1224 (3d ed. 2016). In the Fifth Circuit, the heightened pleading standards of Rule 9(b) may be relaxed, and fraud may be pled on information and belief, where "the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003). This is not, however, "license to base claims of fraud on speculation and conclusory allegations," and "the complaint must set forth a factual basis for such [information and] belief." *Id.*

The Court finds that the trustee has adequately set forth a factual basis for its claim of successor liability based on fraudulent transfer. Transfers to avoid liability are fraudulent. The answer to whether or not the formation of SIBS was accomplished for the purpose of avoiding liability is peculiarly within the knowledge of ScanTech IBS and SIBS. Information and belief pleadings are therefore appropriate and acceptable here.

Turning to the factual basis for such pleadings, the trustee claims that "the purpose for the formation of [SIBS] was avoidance of liability, and as such, [SIBS] is liable for the obligations and liabilities it incurred while functioning as ScanTech IBS." Am. Compl. ¶ 249. Standing alone, this statement would be insufficiently conclusory even under the relaxed standards of Rule 9(b). The trustee, however, includes the following factual allegations supporting his assertion of fraudulent transfer: 1) "at the time of the formation of [SIBS], ScanTech Holdings and ScanTech IBS were aware of numerous actual and potential liabilities, including significant liabilities related to this action, which they sought to avoid through the formation of [SIBS]," and "ScanTech IBS

53

was left without any substantial assets and certainly without assets sufficient to satisfy any potential judgment against it in this action;" 2) by the time SIBS was formed, "ScanTech IBS had already been sued in relation to the same activities that gave rise to this action," specifically in a lawsuit commenced on February 4, 2010 by Sami Dagher, defendant Yaqub's business partner; 3) by the time SIBS was formed, ScanTech Holdings and ScanTech IBS knew that CryptoMetrics had commenced Bankruptcy proceedings, and SIBS was formed four days after establishment of the Creditors' Trust; and 4) "the formation of [SIBS] was designed to preserve any goodwill garnered by ScanTech IBS by ensuring that the creation of the new company would be unnoticeable to customers of ScanTech IBS and others, while attempting to protect [SIBS] from accumulated liabilities," as a result of which "the new company was given a name almost identical to its predecessor," and it "maintained the same premises, equipment, and employees as ScanTech IBS, and in all other respects, continued the business of ScanTech IBS." Am. Compl. ¶¶ 244–49.

The Court rejects the defendant's argument that the trustee failed to allege actual intent to defraud creditors. Again, even in the context of claims for fraud, intent "may be alleged generally." Fed. R. Civ. P. 9(b). The Delaware Code enumerates various factors that evidence actual intent, including: 1) "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; and 2) "[t]he transfer was of substantially all the debtor's assets." 6 Del. C. § 1304(b). The trustee has alleged that by the time of the transfer, ScanTech IBS had been sued in relation to the same activities giving rise to the current lawsuit, and knew that CryptoMetrics, its former business partner, had commenced bankruptcy proceedings. He has also alleged that as a result of the transfer, ScanTech IBS was left without any substantial assets. Taking these allegations as true, as the Court must at this stage, the trustee has sufficiently alleged that the transfer was made with actual fraudulent intent. The factual allegations listed above are sufficient,

under the more relaxed pleading standard of Rule 9(b) for information and belief pleadings, to state a claim for successor liability based on fraudulent transfer to avoid liabilities. Because the Court finds that the trustee has stated a claim for successor liability based on fraudulent transfer, it does not determine whether the trustee also stated a claim for successor liability based on the mere continuation theory. The Court now turns to whether the trustee has adequately pled the underlying RICO claim.

### c)    Civil RICO Claims

RICO prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). It is also unlawful for any person to conspire to violate RICO. 18 U.S.C. § 1962(d). To state a RICO claim, plaintiffs must allege the following elements: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007).

Potential RICO defendants include "any person employed by or associated with any enterprise." 18 U.S.C. § 1962(c). "Person" includes "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Such persons must be involved in a "pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity," also known as "predicate acts" or "predicate offenses," is defined in a lengthy statutory provision which enumerates various criminal acts under both state and federal law. *See* 18 U.S.C. § 1961(1). Both bribery and travelling in aid of racketeering activities (such as bribery) are listed as example of racketeering activity. *See* 18 U.S.C. § 1961(1).

A pattern of racketeering activity "consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *Abraham*, 480 F.3d at 355 (internal quotation marks omitted). Predicate acts are "related" if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989). With respect to the continuity element, it "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Closed-ended continuity may be show by alleging "a series of related predicates extending over a substantial period of time." *Id.* at 242.

Finally, an "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has made clear that this definition is "broad" and "expansive," and includes "associations in fact." *Boyle*, 556 U.S. at 944–45. Associations in fact must have some sort of structure with the following features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. They need not, however, be adorned with features such as "a hierarchical structure or a 'chain of command.'" *Id.* at 948. Associations in fact are "simply a continuing unit that functions with a common purpose. . . . [D]ecisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.*

The elements of a RICO conspiracy claim are that "(1) two or more persons agreed to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall objective of the RICO offense." *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 551 (5th Cir. 2012). These elements may be established through circumstantial evidence and "[t]he agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collocation of circumstances.'" *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998). Thus, to allege an agreement, plaintiffs must allege that defendants. "by [their] words or actions, . . . have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).

The Barras and Vitale argue that the trustee has failed to adequately allege a pattern of racketeering activity or the existence of an enterprise. SIBS argues that the trustee has failed to adequately allege all three elements of a RICO violation: a person, a pattern of racketeering activity, and the existence of an enterprise. SIBS also argues that Count XI, for RICO conspiracy is insufficient because the Complaint fails to allege an agreement to commit a conspiracy.

### (1)    Person

The Court first rejects SIBS' argument that it is not a RICO "person" because the trustee did not identify SIBS as a "person" employed or associated with the Joint Marketing Association. The trustee identified ScanTech IBS as a RICO person associated with the enterprise. The Court has found that the trustee has adequately pled successor liability. Therefore, SIBS is liable for the acts of ScanTech IBS as part of the RICO enterprise.

(2)     *Pattern of Racketeering Activity*

The Court also rejects SIBS' argument that it did not engage in any predicate acts, let alone a pattern of racketeering activity, for the same reason identified above: SIBS is liable for the acts of ScanTech IBS. The Court also finds that the trustee has adequately alleged a pattern of racketeering activity. He has identified more than two predicate acts of bribery, and has described specific trips made for the purpose of facilitating illegal bribes in violation of 18 U.S.C. § 1952. Am. Compl. ¶¶ 333, 342. He has also identified specific payments made to facilitate bribes. Am. Compl. ¶¶ 334–35, 343–44. These acts, all allegedly committed with the intent to facilitate illegal bribes to foreign officials in order to secure contracts for CryptoMetrics, were clearly related. They had the same purpose, and much of the same "results, participants, victims, or methods of commission." *H.J. Inc.*, 492 U.S. at 240.

The trustee has also sufficiently alleged that the acts were continuous. The trustee alleges in Count IX that these acts were committed between 2006 and 2009, and in Count X and XI the trustee alleges that these acts were committed either between 2006 and 2009 or 2007 and 2009. Am. Compl. ¶¶ 333–35, 342–44, 351–53. The Court concludes that the trustee has alleged closed-ended continuity by showing a series of related acts (as already concluded) extending over a substantial period of time. *See H.J. Inc.*, 492 U.S. at 242. The approximately two to three year time period alleged is sufficiently substantial. *Cf. id.* ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."); *see Hewlett-Packard Co. v. Byd:Sign, Inc.*, No. 6:05CV456, 2007 WL 275476, at *5 (E.D. Tex. Jan. 25, 2007) (22 months is a substantial period); *Commercial Metals Co. v. Chazanow*, No. CIV.A. 309-CV-0808-B, 2009 WL 3853704, at *7 (N.D. Tex. Nov. 17, 2009) (32 months is a substantial period). Therefore, the trustee has sufficiently alleged a pattern of racketeering activity.

### (3)    Enterprise

The Court also finds that the trustee has adequately alleged the existence of an enterprise. In Count IX, he alleges that defendants Robert Barra, Susan Barra, and Stolzar were each employed by or associated with CryptoMetrics, a legal entity. *See* 18 U.S.C. § 1961(4). In Counts X and XI he alleges that ScanTech Holdings, ScanTech IBS, and CryptoMetrics formed the Joint Marketing Association, an association in fact. The Court first rejects defendants' argument that the Joint Marketing Association was not an association in fact because it either did not have some sort of hierarchical or consensual decision-making structure, or because it did not exist for some purpose other than to commit the predicate acts. The Supreme Court in *Boyle* rejected both of these arguments, first specifically stating that "[s]uch a group need not have a hierarchical structure [and] decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 556 U.S. at 948. It also rejected the argument that "an association-in-fact enterprise must have 'an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages,'" finding that the existence of an enterprise is simply a separate element that must be proved, not that "the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Id.* at 947.

The trustee has sufficiently alleged the existence of an enterprise in fact. The trustee alleges that the Joint Marketing Association had a purpose: "pursuing business opportunities in the Middle East and for the mutual benefit of ScanTech Holdings, ScanTech IBS, and CryptoMetrics." Am. Compl. ¶ 340. There were relationships among those associated with the enterprise; the Complaint describes how CryptoMetrics and the ScanTech entities jointly marketed their products and services, specifically with respect to broad range facial biometric-enabled solutions in Jordan. Am

Compl. ¶¶ 6, 193–95.   And, the Joint Marketing Association had longevity; the Complaint describes actions it took over the course of several years.

Therefore, the Court concludes that the trustee has sufficiently alleged all of the element of a civil RICO claim.   It declines to dismiss Counts IX and X.

### d)    RICO Conspiracy

SIBS argues that the Complaint fails to sufficiently allege an agreement to commit a conspiracy.   Again, the trustee has sufficiently alleged that SIBS is liable for the actions of ScanTech IBS under a theory of successor liability.   The Complaint alleges that Barra, Shaw, Yaqub, ScanTech Holdings, and ScanTech IBS "mutually agreed to conduct the affairs of the Joint Marketing Association through a pattern of racketeering activity," pursuant to which they each "agreed to commit, and ultimately did in fact commit, multiple acts constituting prohibited racketeering activity."   Am. Compl. ¶ 350.   The Complaint then goes on to describe trips made by the defendants, including senior executives of ScanTech IBS, to the UAE in order to facilitate the payment of illegal bribes between 2007 and 2009.   Am. Compl. ¶¶ 351, 197–206.   It also describes how the ScanTech entities introduced CryptoMetrics to Yaqub and Dagher, senior ScanTech IBS executives to CryptoMetrics, after which the defendants formed the Joint Marketing Association. Am. Compl. ¶¶ 5–6.   Given the plethora of factual allegations regarding the racketeering activity undertaken by the Joint Marketing Association, the Court finds that, by their actions, ScanTech IBS "objectively manifested an agreement to participate, directly or indirectly, in the affairs of [the Joint Marketing Association] through the commission of two or more predicate crimes." *Elliott*, 571 F.2d at 903 (5th Cir. 1978).   The trustee has sufficiently pled his RICO conspiracy claim in Count XI.

The Court also declines to require the trustee to submit a RICO case statement. Although a RICO case statement would no doubt be "useful" in many situations, *see Marriott Bros. v. Gage*, 911 F.2d 1105, 1107 (5th Cir. 1990), the Court does not find it necessary here. The trustee has adequately pled his RICO claims, and the Court finds that the Complaint contains sufficiently detailed factual allegations. There is no need for a RICO case statement here.

## IX.    CONCLUSION

In sum, the Court finds that it has subject matter jurisdiction over Counts I–V based on the "arising under" jurisdiction of 28 U.S.C. § 1334(b). It has subject matter jurisdiction over Counts VI–VII, IX–XI, and XIV based on the "related to" jurisdiction of 28 U.S.C. § 1334(b).

Because the Plan and/or Disclosure Statement here expressly, specifically, and unequivocally preserved the claims brought in Counts I–VII, IX–XI, and XIV, the trustee has standing to assert such claims. Because the Plan and Disclosure Statement failed to expressly, specifically, and unequivocally preserve the claims brought in Counts VIII, XII, and XIII. The trustee does not have standing to assert these claims and the Court will accordingly dismiss Counts VIII, XII, and XIII.

The Court also concludes that the *Wagoner* rule does not preclude standing to bring claims that the Stolzar defendants aided in defrauding a third party in Counts IX and XIV because the trustee has alleged harm distinct from the harm to creditors. However, the *in pari delicto* defense applies to the RICO claim brought against the Stolzar defendants in Count IX, and the first three breach of fiduciary duty claims brought against the Stolzar defendants in Count XIV. The Court will dismiss those claims.

The Court also finds it has personal jurisdiction over defendant SIBS and that the trustee has sufficiently pled successor liability based on a theory of fraudulent intent. The trustee has met

61

the pleading standards of Rules 12(b)(6) and 9(b) and stated claims for relief in the counts alleged. However, because the trustee is not a bank with standing to bring a claim for bank fraud as a predicate RICO act, this claim shall be stricken from the Complaint and cannot form the sole basis of the trustee's RICO allegations.

A separate order accompanies this Memorandum Opinion.

Date: March __2__, 2017

Royce C. Lamberth
United States District Judge